**Sheila BLANTON et al., Plaintiffs-Appellants,**

v.

**STATE UNIVERSITY OF NEW YORK et al., Defendants-Appellees.**

**Nos. 19, 20, Dockets 73–1088, 73–1259.**

United States Court of Appeals, Second Circuit.

Argued Oct. 9, 1973.

Decided Nov. 19, 1973.

378

David C. Leven, Rochester, N. Y. (Michael J. Nelson, Joseph B. Stulberg, Marcia Boyd, and Monroe County Legal Assistance Corp., Rochester, N. Y., of counsel), for plaintiffs-appellants.

Grace K. Banoff, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of the State of New York, and Ruth Kessler Toch, Sol. Gen., Albany, N. Y., of counsel), for defendants-appellees.

Before FRIENDLY, ANDERSON and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

In this action under the Civil Rights Act, 42 U.S.C. § 1983, and its jurisdictional implementation, 28 U.S.C. § 1343(3), five students who had been suspended for a semester from the College of Arts and Science at Geneseo, a part of the State University of New York, sued the University and Robert W. MacVittie, President of the College, for damages and an injunction. The District Court for the Western District of New York granted defendants' motion for summary judgment and this appeal followed.

I.

The dispute had its background in a demand by the Geneseo Afro-American Student Society that the College assign all black male students to one dormitory on campus and all black female students to an adjacent dormitory. A meeting between representatives of the black student group and College President Mac-Vittie to discuss this had been scheduled for December 3, 1970. Apparently to underscore their demand, a group of black students planned a "sleep-in" or series of "sleep-ins" in a lounge of Wyoming Hall, one of the college dormitories, beginning on the evening of Wednesday, December 2. That night, six black female students, apparently nonresidents of Wyoming Hall, went to that dormitory and joined nine black female residents. They placed blankets and pillows on the floor of the dormitory lounge and prepared to sleep there. At some point during the evening Assistant Dean Ruth M. Stahl granted special permission to the students to remain in the lounge for that night. She later indicated that the "sleep-in" was in violation of college housing regulations, but that she had granted permission for that particular night because she did not want to risk upsetting the meeting next morning between President MacVittie and the black students. The next night, Thursday, December 3, a group of students returned to Wyoming Hall to stage a second sleep-in.[1] Shortly after midnight, Resident Advisor Mary Lucas asked the nonresident students to leave. Subsequently Assistant Dean Stahl arrived in the lounge area and reiterated this request; the nonresident students, however, still refused to depart. She later stated that she had also instructed the residents of Wyoming Hall to return to their rooms, but that no one had complied. She said that she had then asked

---

1. We here follow the version given in the affidavits of the college authorities but note in what respects plaintiffs challenge this.

those students whom she did not know to give her their names, but that this third request was also ignored. Assistant Dean Suzanne Keller, who was with Dean Stahl, corroborated her account, indicating that Dean Stahl had instructed both nonresidents and residents to leave the area. Plaintiffs Marshall, Smith and Barrow, who were residents of Wyoming Hall, contend that either Dean Stahl did not tell them to return to their rooms or that they did not hear her make that request. However, all the plaintiffs admit that she instructed the nonresidents to leave the building, and that there was no response to that order. They likewise do not contradict the refusal of some students to identify themselves.

The sleep-in was repeated for a third time the next evening, Friday, December 4, and the night passed without incident. Late the next morning, while some of the protesters were still sleeping on the lounge floor, one of the white female residents of the dormitory apparently stepped or tripped over one of the plaintiffs, Sheila Blanton. Miss Blanton allegedly cursed and kicked the girl, who hurried into her suite.

Late Friday, twelve white residents of Wyoming Hall sent a memorandum to the administration protesting the series of sleep-ins. They claimed that the nightly sessions, accompanied by noise and disputes over the turning on and off of lights, had disrupted life in the dormitory[2] and that some of the residents "were subjected to abusive language and verbal intimidation." They indicated that an atmosphere of fear had developed in Wyoming Hall as a result of the disruptions of the prior two evenings. On Saturday afternoon, a number of the white residents of the dormitory met with Leo Salters, the College's Dean of Student Life, in further protest against the continuing sleep-ins. When it became evident that Saturday would bring another all-night session in the lounge, Dean Salters decided to attempt to resolve the situation. At 3:30 A.M. on Sunday, Dean Salters and a group of administration officials went to Wyoming Hall in an effort to get the group of about 20 black students to disperse.[3] He instructed all nonresidents to leave the building at that time. None of the students left. Asked to identify themselves, many of the students refused or gave fictitious names, according to Dean Salters' report. After the administration officials left, the group of black students broke up.

On December 5, plaintiffs Marshall, Barrow and Smith, among others, received notices from the administration that they had been reported for unauthorized use of residence hall facilities, verbal intimidation, a refusal to identify themselves, and failure to comply with a legitimate request by a college official. The request referred to was Dean Stahl's order on the morning of December 4 that they return to their rooms in Wyoming Hall. Plaintiff Blanton, a nonresident, received a similar notice, which added a reference to her refusal to leave the building upon being ordered to do so. On December 8, Dean Salters sent a second round of notices to various participants in the Sunday morning incident. Plaintiffs Porter and Blanton were cited for failing to comply with a legitimate request of a college offical and for being in a group some of whom had failed to identify themselves upon request.

Hearings on both sets of notices were set before the Discipline Hearing Committee for Friday, December 18.[4] Two

---

2. The lounge, a small one, is immediately adjacent to some dormitory rooms.

3. Plaintiffs contend that the Saturday night incident was not a sleep-in and that a college regulation allowed the lounge to be used 24 hours a day over weekends.

4. A school handbook, entitled "Student Affairs, College Services and Policies, 1970–71," describes the disciplinary procedure as follows:

The nine members of the Discipline Hearing Committee are appointed accord-

days before the hearing, Vice President David A. Young wrote each of the twenty students who had received hearing notices, including the five plaintiffs. He informed them that they could have copies of the reports that had been filed in connection with the sleep-in incidents. His letter indicated that the committee would seek to answer "two fundamental questions":

(1) Did you knowingly fail to obey the instructions of a College official to return to your room (if a Wyoming resident) or to leave the building (if· a nonresident)?

(2) If so, should the College permit you to remain a student?

This eliminated the probably objectionable charge of belonging to a group some of whom had refused to identify themselves. The letter added that the committee would meet with one student at a time and that each student would be given five minutes to make an opening statement.[5] Following that, the letter noted, "Committee members will have the opportunity to ask questions. As in all hearings, any advisor accompanying a student will speak only to the student and will not address the Committee directly."

At the hearing, which Dean Salters attended, several of the students took the opportunity to make opening statements, and each was questioned about his or her part in the sleep-in incidents. At the end of each student's hearing, the committee asked whether there was anything further the student would like to say, and each answered in the negative. None requested the opportunity to confront or cross-examine those who had filed reports containing accounts of their alleged misconduct.

On December 22, Vice President Young again wrote to each of the plaintiffs, this time informing them that the committee had decided to suspend them for a semester.[6] He added that the students could take an appeal to the President of the College within two days of their receipt of his letter. According to Young, the President would then "make an appointment for an interview if your letter shows that you have good reason to believe that the Committee erred in (1) concluding that you did disobey a College official, (2) following established disciplinary procedures, or (3) taking action consistent with your past conduct and expressed attitude about future conduct." Apparently only plaintiff Blanton appealed her suspension.

ing to a procedure determined by the State University Trustees. Three teaching faculty members (with one alternate) and three administrative faculty members (with one alternate) are appointed by the president. The six members in turn select three student members and at least one alternate from among nominees designated by the student body president. Any five members may conduct a hearing.

A student required to appear before the Committee is told the purpose and nature of the hearing by letter ten days in advance as well as in his staff interview. A disciplinary report is then made available to the student on request, specifying alleged misconduct and sources of information. During the hearing, the vice-president for student affairs or his representative participates as a non-voting coordinator. No information regarding alleged misconduct is presented by the coordinator or by Committee members. The student is asked to explain his view of the situation in question and offered an opportuni-

ty to discuss with members of the Committee all implications of his behavior. He may bring a reasonable number of other persons to provide relevant information on his behalf. The Committee also may request the appearance of resource persons. Hearings are not otherwise open, and persons other than one permanent advisor designated by the student will normally be interviewed separately.

The recommendation of the Committee is communicated to the student orally and in writing and is considered a matter of confidential information. Final authority for a decision involving possible suspension or dismissal rests with the president of the College only, to whom any request for an interview must be made by the student within two days after notification of a Committee action.

5. Alternatively, they could file written statements.

6. Less severe discipline was administered to the other 15 students.

A week later, President MacVittie wrote to each of the plaintiffs. He said he had reviewed the recommendation of the disciplinary hearing committee and had decided to uphold the committee's decision in each case. The letter informed each plaintiff that he or she was suspended, effective immediately, but made clear that they would all be eligible to return in the summer or fall terms.

Three weeks later, the plaintiffs filed the instant suit against the University and President MacVittie, seeking declaratory and injunctive relief as well as money damages under 42 U.S.C. § 1983. Plaintiffs alleged that the college officials had illegally suspended them, and that the suspensions were unconstitutional for three reasons: their conduct was protected under the First Amendment, the disciplinary procedures used by the Disciplinary Hearing Committee violated their Fourteenth Amendment due process rights, and the suspensions constituted cruel and unusual punishment in violation of the Eighth Amendment. After having denied a temporary injunction, the district court later granted a motion by defendants for summary judgment dismissing the complaint.

## II.

■ In the first instance the defendants ask us to affirm the judgment on the ground that even if the plaintiffs had initially been entitled to some relief, the case is now moot. The semester suspension has long since expired. Three plaintiffs, Smith, Marshall and Barrow reentered the College in September, 1971; Smith graduated, Marshall is currently enrolled, and Barrow withdrew in December, 1971. The suspensions are shown on plaintiffs' academic records as withdrawals. Anyone seeking to know the reason for the "withdrawals" must furnish the written permission of the student. Defendants argue that the ab-

sence of any discrediting material in the plaintiffs' records distinguishes this case from Winnick v. Manning, 460 F.2d 545, 548 n. 3 (2 Cir. 1972), where we held that such notations on a student's record preserved against mootness a suit to enjoin a suspension that had expired. Defendants also contend, correctly, that the State University is not a "person" within 42 U.S.C. § 1983, see Zuckerman v. Appellate Division, 421 F.2d 625, 626 (2 Cir. 1970); Sams v. New York State Board of Parole, 352 F.Supp. 296, 298–299 (S.D.N.Y.1972) (Weinfeld, J.), and cases cited therein; cf. Monroe v. Pape, 365 U.S. 167, 189–192, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). Finally, the defendants assert that President MacVittie cannot be held liable in damages for his official acts, under the official immunity doctrine of Barr v. Matteo, 360 U.S. 564, 569, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), see Doe v. McMillan, 412 U.S. 306, 324 n. 15, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973).

■■ We find it easier to decide the case on the merits than to determine the validity of these preliminary contentions. Although it is hard for us to see how plaintiffs would be benefitted by having their records changed so that, instead of showing withdrawal, they reflected an unlawful suspension, very likely this is something plaintiffs are entitled to decide for themselves. Moreover, the scope of official immunity from damages in suits under the Civil Rights Act is, to put it mildly, not pellucidly clear. See Pierson v. Ray, 386 U.S. 547, 554, 555–557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Birnbaum v. Trussell, 347 F.2d 86, 88–89 (2 Cir. 1965); Jobson v. Henne, 355 F.2d 129, 133–134 (2 Cir. 1966); Dale v. Hahn, 440 F.2d 633, 636–638 (2 Cir. 1971); 3 Davis, Administrative Law Treatise § 26.06 (1958).[7]

---

7. Plaintiffs argue that the defendants should not be permitted to raise the immunity defense because they did not expressly advance it below. However, the prevailing party be-

low may raise on appeal "any ground in support of his judgment, whether or not that ground was relied on or even considered by the trial court." Dandridge v. Williams, 397

## III.

Plaintiffs argue that the court should not have granted summary judgment since the affidavits disclosed genuine issues of fact. If plaintiffs were correct in their implicit assumption that the district court was obliged to determine exactly what happened on the nights of December 3 and 5, 1970, that could well be true. But the issue before the court was simply whether plaintiffs' constitutional rights were abridged. If the answer is in the negative even on plaintiffs' version of the facts, the grant of summary judgment was not improper, although we note our doubt whether the use of summary judgment procedures in a case like this does not increase rather than reduce the aggregate burden on court and counsel.

Our recital of the facts makes evident that as to four of the plaintiffs, this would be an appealing case for application of the principle of Eisen v. Eastman, 421 F.2d 560 (2 Cir. 1969), cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L. Ed.2d 75 (1970), that a plaintiff challenging the constitutionality of state action must exhaust speedy and effective state administrative remedies. The suspensions were directed not by the Discipline Hearing Committee but by President MacVittie, yet only plaintiff Blanton took an appeal to him. The handbook given to the students had clearly informed them that the committee could merely recommend suspension and that final authority rested in the president. Vice President Young's letter of December 22 reminded the students that they could appeal to the president and that he would make an appointment for an interview. Letters sent by President MacVittie to some of the plaintiffs show that he took his responsibility seriously and endorsed the committee's recommendations with some anguish. Yet at least four of the plaintiffs apparently never told him of the complaints they subsequently made in court, including claims that the committee had not given them an adequate opportunity to develop the facts and was improperly constituted due to the presence of Dean Salters. Whatever fears may be entertained with respect to an exhaustion requirement in situations where a plaintiff is already suffering an injury, there is no basis for these in a case like the present where the state affords the administrative remedy *before* any adverse action is taken.

In *Eisen, supra,* 421 F.2d at 567–569, we distinguished four Supreme Court decisions [8] which were thought by some to have cast doubt on the requirement of exhausting administrative remedies "as simply condemning a wooden application of the exhaustion doctrine in cases under the Civil Rights Act;" we thought a "quite different situation would be presented, for example, when a complaint alleged that a subordinate state officer had violated the plaintiff's constitutional rights by acting because of bias or other inadmissible reasons, by distorting or ignoring the facts, or by failing to apply a constitutional state

U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156, 25 L.Ed.2d 491 (1970). See United States v. American Railway Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087 (1924) ; Bondholders Committee v. Commissioner, 315 U.S. 189, 192 n. 2, 62 S.Ct. 537, 86 L.Ed. 784 (1942) ; Williams v. Bank of America National Ass'n, 55 F.2d 884, 888 (2 Cir. 1932). Of course, if the plaintiff can develop relevant facts in response to the newly-raised defense, and if the defense is essential to the decision, the appellate court must remand to the trial court for a determination of the facts, just as the court would do if the trial court had considered the defense and had improperly granted summary judgment for the defendant on that issue. Because we have chosen to decide this case on the merits, we need not determine whether a ruling on the applicability of the immunity defense under § 1983 would require a factual hearing in this case.

8. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963) ; Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967) ; King v. Smith, 392 U.S. 309, 312 n. 4, 88 S.Ct. 2128, 20 L. Ed.2d 1118 (1968) ; Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968).

standard, and the state has provided for a speedy appeal to a higher administrative officer," a good description of the situation here. Three more Supreme Court decisions now require consideration, Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); Carter v. Stanton, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); and Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). The first two, like *Damico* and *Houghton*, were summary per curiam reversals on petitions for certiorari. Despite the references to administrative appeals in *Wilwording*, the opinion below, 439 F.2d 1331 (8 Cir. 1971), indicates that what the court of appeals had been suggesting was preliminary resort to the state *courts* to assert various claims, including those under the State Administrative Procedure Act.[9] *Carter* simply followed *Damico*, which it correctly described as "an indistinguishable case," in holding that where a welfare regulation was challenged as unconstitutional, there was no need first to ask the promulgating authority to admit its error. Gibson v. Berryhill seems to support our conclusion in *Eisen* that the doctrine requiring exhaustion of administrative remedies is not dead in civil rights cases—an interpretation emphasized by the concurring opinions, 411 U.S. at 581, 93 S.Ct. 1689, 36 L.Ed.2d 488, in which Justices Marshall and Brennan asserted the opposite. The plaintiffs in *Gibson,* licensed Alabama optometrists, had brought suit to enjoin proceedings against them pending

before the Alabama Board of Optometry. On appeal, the Supreme Court agreed with the three-judge district court that exhaustion of administrative remedies was not required, but it expressly declined to rely on the broad dicta in its earlier cases suggesting that such exhaustion is never required in civil rights suits. Instead, the Court ruled that in *Gibson* exhaustion would not be required because the plaintiffs' complaint was that the state agency "was unconstitutionally constituted and so did not provide them with an adequate administrative remedy requiring exhaustion" and that "the question of the adequacy of the administrative remedy, an issue which under federal law the District Court was required to decide, was for all practical purposes identical with the merits of appellees' lawsuit." 411 U.S. at 575, 93 S.Ct. at 1696, 36 L.Ed.2d 488.[10]

■ While we therefore see no occasion to retreat from this portion of *Eisen*, it is unnecessary to go as far as to hold that the four plaintiffs' failure to appeal to the President of the College constituted an absolute bar at least as to their due process claims. At minimum such failure to appeal can be taken as one of the factors to be weighed in determining whether these plaintiffs were deprived of any of their constitutional rights.

## IV.

■ Plaintiffs claim that in three respects the procedure followed by the

---

9. In Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), the Court cited cases dealing with the exhaustion of administrative remedies in support of the proposition that "if a remedy under the Civil Rights Act is available, a plaintiff need not first seek redress in a state forum." 411 U.S. at 477, 93 S.Ct. at 1830, 36 L.Ed.2d 439, see also *id.* at 492–493, n. 10, 93 S.Ct. 1827, 36 L.Ed.2d 439. As in *Wilwording,* however, the question before the Court was whether, under the circumstances, exhaustion of state *judicial* remedies should be required.

10. In a footnote to this passage of *Gibson,* Mr. Justice White, writing for the Court,

noted that "[s]tate administrative remedies have been deemed inadequate by federal courts, and hence not subject to the exhaustion requirement, on a variety of grounds." 411 U.S. 575 n. 14, 93 S.Ct. 1689, 36 L.Ed. 2d 488. Justice White referred to exhaustion exceptions for agency delay, doubt as to the agency's power to grant effective relief, and agency bias or predetermination of the issue in question. By citing civil rights cases along with others in discussing these exceptions, the Justice seemed to imply that the exhaustion requirement should be analyzed on a case-by-case basis, whether the federal claim is brought under § 1983 or otherwise.

Discipline Hearing Committee deprived them, or certain of them, of the due process of law required by the Fourteenth Amendment.

The first point, open only to plaintiffs Marshall, Smith and Barrow, is that they were denied an opportunity to cross-examine Assistant Deans Stahl and Keller on the issue whether Dean Stahl instructed residents of Wyoming Hall to return to their rooms.

In the path-breaking decision recognizing the due process rights of students at state universities, Dixon v. Alabama State Board of Education, 294 F.2d 150, 158–159 (5 Cir. 1961), Judge Rives outlined a number of procedural standards for school disciplinary actions, but then added: "This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required." Plaintiffs point out that *Dixon* antedated the holding in Goldberg v. Kelly, 397 U.S. 254, 270, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), that a welfare recipient must be afforded the right to confront and cross-examine witnesses before benefits are terminated, and note our statement in Winnick v. Manning, *supra*, 460 F.2d 545 at 550, that if a case of a substantial suspension of a state university student has resolved itself into a problem of credibility, "cross-examination of witnesses might [be] essential to a fair hearing."[11]

As in *Winnick,* we do not find it necessary to decide the point. While the procedures described in the college handbook do not provide for cross-examination, they do not expressly exclude it. The same is true of the notices of hearing sent to each of the plaintiffs. Marshall, Smith and Barrow did not even avail themselves of the right to bring a reasonable number of other persons who might have provided relevant information in their behalf, let alone seek the right to cross-examine. When Marshall was asked whether she would have left if she had heard Dean Stahl ask her to go to her room, she said she would not unless the Dean had given a good reason. Smith was primarily interested in explaining the importance to her of the black students' demands, not in exploring the details of what had happened. Barrow was content with saying that she didn't remember Miss Stahl asking her to return to her room—she did not claim that Miss Stahl had not made the request. If the three students had considered that the Committee's recommendations for their suspension had been based on an incorrect version of the facts, it was open to them to raise the point before President MacVittie. We are left with the firm impression that the students made no real attempt to convince anyone that Dean Stahl had not done what she and Dean Keller said she had done and that the claim about cross-examination is an afterthought of resourceful counsel.

Less stressed is plaintiff Blanton's contention that the committee's inquiry went beyond the questions stated in Vice President Young's letter. Apparently her complaint is that her interview included some reference to the kicking incident on December 5. However, the transcript of the hearing reveals that it was Miss Blanton who first mentioned the incident in answer to the question, "Do you feel you were doing

---

11. Judge Timbers cited Professor Charles Alan Wright's lecture on the Holmes Devise, The Constitution on the Campus, 22 Vand. L.Rev. 1027 (1969). Referring with approval to Professor Clark Byse's view that there is no general right to confrontation in cases of student discipline but that confrontation and cross-examination may be required where they are "the conditions of enlightened action," The University and Due Process: A Somewhat Different View, 54 AAUP Bull. 143, 145 (1968), Professor Wright states his own position as being that "if the case resolves itself into a problem of credibility, and the tribunal must choose to believe either the accused or his accuser, cross-examination is the condition of enlightened action and is therefore required in the interest of fairness and reasonableness." Presumably Professor Wright would limit this to "serious" sanctions, such as expulsion or suspension for a substantial period, see *id.* at 1070–71.

harm to anyone else?" Moreover, the incident was so much a part of the background for Dean Salters' action on Sunday morning that its introduction could hardly have come as a surprise. While "[n]o court since *Dixon* has denied that the student must be given prior notice of the grounds on which the charge is based," it is also true that a notice "need not be drawn with the precision of a criminal indictment." C. Wright, *supra,* 22 Vand.L.Rev. at 1072.

■ Plaintiffs' final due process point is that Dean Salters attended the meeting of the Discipline Hearing Committee—apparently as "a non-voting coordinator" representing the Vice President for Student Affairs, see n. 4 *supra.* They claim that since he participated in the Sunday morning incident, his presence "divested the Discipline Hearing Committee of its impartiality."

■ In Wasson v. Trowbridge, 382 F.2d 807, 813 (2 Cir. 1967), we dealt with a related problem. We there held that in the administration of student discipline, there was no absolute bar to inclusion even on the hearing panel of persons having had some previous contact with the incident, but that in such event the student should be given an opportunity "to show that members of the panel had had such prior contact with his case that they could be presumed to have been biased." It would follow *a fortiori* that Dean Salters' mere presence at the hearing would not invalidate the decision, especially since there was no factual controversy concerning his directions to the students on Sunday morning. In any event the students were given a full opportunity to present their case to a decision maker with no previous involvement in the incident, President MacVittie. He was in no way bound by the Committee's recommendation, but was free to make his own determination of the facts and his own decision of the proper punishment. If a state university supplies such a decision maker before the process is ended, a previous flaw, if any, becomes immaterial. See Winnick v. Manning, *supra,* 460

F.2d 545 at 549. Compare Opp Cotton Mills, Inc. v. Administrator, 312 U.S. 126, 152–153, 61 S.Ct. 524, 85 L.Ed. 624 (1941).

### V.

■ The only other point requiring consideration is plaintiffs' argument that their actions were taken to further their demand for all black dormitories and were therefore protected by the First Amendment.

The contention is largely answered by Mr. Justice Powell's opinion in Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). He there stated that "the critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not," and that "[j]ust as in the community at large, reasonable regulations with respect to the time, the place, and the manner in which student groups conduct their speech-related activities must be respected," 408 U.S. at 192–193, 92 S.Ct. at 2351, 33 L.Ed.2d 266. See also Grayned v. City of Rockford, 408 U.S. 104, 118, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

The handbook announced, under the rubric "Campus Demonstrations," that "Student demonstrations are governed in general by guarantees of academic freedom and by conduct regulations against disruption of College activities." Among the specific examples of disruptive action which would be subject to discipline were "blocking access to or exit from any College premise" and "failure to vacate premises when legitimately asked." It stated that the College wished to avoid the necessity for regulating demonstrations in a more detailed manner and that with "the full cooperation of those who choose this form of expression, it will be able to do so."

There is nothing to suggest that the College imposed the slightest hindrance on the black students' rights to petition, to hold meetings, or to endeavor to enlist the aid of other students by persuasion, including persuasion which the students

did not want to hear. But the College had the right to say that a sleep-in was not an acceptable form of advocacy. Apart from the strain which this imposed on administrative personnel, it was fraught with the danger of provoking interracial hostility. The other occupants of Wyoming Hall had the right of access to and from their rooms without having to step over the bodies of the protesters. See Powe v. Miles, 407 F.2d 73, 85 (2 Cir. 1968). With respect to the Sunday morning confrontation, we are satisfied with the State's argument that if the students were merely engaged in card-playing or listening to records for their amusement, their conduct was not protected by the First Amendment, and that if they were engaged in or preparing for another sleep-in, the College could lawfully order them to disperse.

Affirmed.