**Raul GONZALEZ, Plaintiff,**

v.

**Albert SHANKER et al., Defendants.**

**No. 75 Civ. 1705.**

United States District Court,
S. D. New York.

July 31, 1975.

---

Layton & Sherman, New York City, for plaintiff; Donald S. Hillman, Fredrick E. Sherman, New York City, of counsel.

James R. Sandner, Gen. Counsel, New York City, for defendants U.F.T.; Jeffrey S. Karp, New York City, of counsel.

W. Bernard Richland, Corp. Counsel, New York City, for City defendants; Joseph F. Bruno, Asst. Corp. Counsel, New York City, of counsel.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

This action arises in the aftermath of the long and bitter struggle for control of Community School District No. 1 on the lower east side of Manhattan.

The plaintiff, Raul Gonzalez, a Puerto Rican, is principal of Junior High School 60M, one of the schools in the embattled area. He brings this action for declaratory relief, injunctive relief, and damages against certain governmental defendants, including the Community Superintendent of School District No. 1, certain members of the Community School Board for that district, the Chancellor and the individual members of the Central Board of Education of the City of New York, and against certain non-official defendants, primarily the United Federation of Teachers and certain of its officers and employees ("the UFT defendants"). The first cause of action in plaintiff's complaint alleges violations of his civil rights under the First and Fourteenth Amendments to the Constitution and under 42 U.S.C. §§ 1981 and 1983. In the second cause of action, plaintiff further claims that all the named defendants, with the exception of the Chancellor and the individual mem-

bers of the Board of Education, conspired in violation of 42 U.S.C. § 1985(3) to deprive plaintiff of the equal protection of the laws and from exercising his rights as a citizen. Finally, plaintiff claims that all the defendants, having knowledge of the conspiracy, and having the power to prevent or aid in preventing it, failed or neglected to do so, thereby violating 42 U.S.C. § 1986. Jurisdiction is predicated on 28 U.S.C. § 1343 and § 2201.

■ All the defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint, primarily on the grounds (1) that plaintiff has not exhausted his available administrative and/or contractual remedies, and (2) that as to most of the defendants, the plaintiff has failed to plead facts of the requisite specificity necessary to establish a claim upon which relief can be granted under 42 U.S.C. §§ 1981, 1983, 1985(3), and 1986. We reject both of these contentions.[1]

## I. Background

The facts of this case are intimately interrelated with the history of the dispute that has embroiled Community School District No. 1 over the past few years. As the plaintiff notes in his complaint, the struggle for control over the governance of the school district has been particularly heated and vitriolic. Elections for school board membership in the district have been conducted in an atmosphere of intense acrimony and racial hostility.[2]

---

1. In their briefs, defendants raise two additional issues which can be treated summarily. First, the defendants suggest that because plaintiff has not been discharged, this case is not "ripe" for adjudication. Dismissal, however, is not the only form of racial discrimination in employment that the Civil Rights statutes can redress. The Civil Rights Acts apply as well to discriminations with respect to the terms and conditions of employment. See, e. g. *Johnson v. Railway Express Agency* (1975), 421 U.S. 454, 95 S. Ct. 1716, 44 L.Ed.2d 295 (1975).

Secondly, several of the defendants maintain that they were improperly served with proc-

ess in this action, and thus the complaint should be dismissed pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. Since the plaintiff maintains that all parties were properly served, this issue cannot be resolved on the basis of the papers now before the Court.

2. For a more complete history of the dispute in Community School District No. 1, see *Coalition for Education v. Board of Elections of City of New York* (S.D.N.Y.1974), 370 F.Supp. 42, *affd.*, 2 Cir., 495 F.2d 1090, and *Fuentes v. Roher* (2d Cir. 1975), 519 F.2d 379 (1975).

The prime protagonists in the dispute have been Luis Fuentes and the United Federation of Teachers. Fuentes, a Puerto Rican, committed to a program of bilingual education, was appointed superintendent of the school district in October, 1972. The majority of the school board at that time consisted primarily of minority group members identified with a community organization known as the Coalition for Education. At the next school board election, held in May, 1973, candidates from the Coalition were opposed by a group called the Committee for Effective Education, a UFT-supported organization which sponsored eight white candidates and one black. This bitterly fought election resulted in the choice of six CEE candidates and three Coalition members. On October 16, 1973, the CEE members prevailed on a vote to suspend Fuentes as superintendent.

Prior to the vote, however, the Coalition had instituted suit in this court claiming that various acts by employees of the Board of Elections had resulted in a discriminatory impact on the rights of minority voters. On October 19, 1973, the Coalition obtained an injunction against Fuentes' suspension. Eventually, the group succeeded in having the entire May, 1973 election set aside as held in a racially discriminatory manner. See, *Coalition for Education in District One v. Board of Elections of the City of New York* (S.D.N.Y.1974), 370 F.Supp. 42, *affd.* (2d Cir. 1974), 495 F.2d 1090. A new election was held on May 14, 1974. This time five CEE candidates and four Coalition members were chosen. On August 8, 1974, by a vote of 5–0 (with the four Coalition members abstaining), Fuentes was again suspended.

It is out of the foregoing events that plaintiff claims the conspiracy to deprive him of his civil rights, and the actual deprivations of those rights, developed. The core of his allegations can be found in paragraphs 29 to 31 of his complaint. There, plaintiff states that prior to the pivotal May, 1973 school board election, he was approached by certain representatives of the UFT, and, in essence, asked to cooperate with the UFT in their campaign against Fuentes and the Coalition. When plaintiff refused, and instead reaffirmed his intention to support Fuentes, plaintiff claims defendant Levine threatened that if a UFT dominated school board were to be elected, they would make it difficult for plaintiff to continue to function as a principal in the district. Thus, plaintiff alleges (Complaint, para. 29):

> "Defendant Levine made it clear that many obstacles would arise to prevent plaintiff from functioning effectively in his position."

The plaintiff now contends that this threat, motivated by both racial animus and a desire to punish him for the exercise of his First Amendment rights, has indeed been carried out. He maintains that he has been "subjected to a deliberate and continuing program of harassment, interference and non-cooperation in the performance of his duties as Principal of J.H.S. 60M" (Complaint, para. 30). In paragraph 31 of the complaint, the plaintiff sets forth fourteen fairly detailed illustrations of this policy of harassment and non-cooperation. Among the allegations are:

> "(a) The Community School Board has failed to act upon the disciplinary recommendations of plaintiff in a manner consistent with the treatment of disciplinary recommendations of non-Puerto Rican principals favored by the U.F.T. . . .

> "(b) The School Board has withdrawn financial support for an existing and effective after-hours Youth Services Agency Center at J.H.S. 60M, forcing the closing of this Center, although the Board has continued to support similar Centers located in

neighboring schools within the District whose principals are favored by the U.F.T. . . .

"(c) Defendant Chancellor Anker and defendant members of the Board of Education, through and by the Office of Buildings, Board of Education, have withheld a desperately needed painting of the entire school. . . ."

As is apparent from the above examples, the illustrations vary in the degree of interference and discrimination alleged. While any one of the allegations may appear to present a trivial or an isolated occurrence, taken as a whole, plaintiff has clearly alleged a substantial interference with his civil rights.[3] Whether or not any of such allegations can be supported by evidence is, or course, a question not now before us.

3. See discussion *infra* p. 868.

4. The provisions read as follows:
"ARTICLE X
GRIEVANCE PROCEDURE
* * * * *
A. *DEFINITION*
1. The term "grievance" shall mean:
a. A complaint by a supervisor covered by this Agreement that there has been as to him a violation, misinterpretation or inequitable application of any of the provisions of this Agreement or of the Memorandum of Understanding between the Board and CSA dated October 1, 1972.
b. A complaint by CSA involving alleged misapplication or misinterpretation of this Agreement or of the Memorandum of Understanding between the Board and CSA dated October 1, 1972.
B. *ADJUSTMENT OF GRIEVANCES*
Grievances shall be presented and adjusted in the following manner:
*FIRST LEVEL–ALL SUPERVISORS*
A supervisor shall within a reasonable time following the act or condition on which his complaint is based discuss the matter with his immediate supervisor in an effort to resolve the problem informally as promptly as possible. It is understood that, if the complaint is resolved informally, no record of the procedures at this level shall be made or kept without the written consent of the aggrieved supervisor.
*SECOND LEVEL–PRINCIPALS*
Where the grievant's immediate supervisor is a district or assistant superintendent, the

## II. *Discussion*

### A. *Exhaustion*

The defendants urge that this complaint be dismissed because of plaintiff's failure to exhaust administrative and/or contractual remedies. They maintain that such remedies are adequate to deal with all the allegations in plaintiff's complaint, including the conspiracy and harassment charges.

The contractual remedies available to plaintiff are contained in an agreement between the Board of Education and the Council of Supervisors and Administrators of the City of New York, Local 1, School Administrators and Supervisory Organizing Committee, AFL–CIO (CSA contract). The pertinent portions of the CSA contract are Article X and XI, the applicable sections of which are set forth in the margin.[4] Article X need

written grievance shall be filed directly with the Chancellor within 30 days of the initial informal discussion with the grievant's immediate supervisor. Within ten (10) school days following receipt of the grievance a conference shall be called by the Chancellor or his designee with a view to arriving at a mutually satisfactory resolution of the complaint. Such conference shall be called on not less than two (2) school days' written notice to the grievant, his immediate supervisor and CSA. The grievant shall be entitled to representation at the conference by CSA or by a supervisor of his choice in the New York City school system. Where the grievant is not represented by CSA, CSA shall be permitted to attend the conference and to present its views. If no mutually satisfactory resolution has been reached at this conference, within twenty (20) school days following the conference, the Chancellor shall communicate his written decision to the grievant and his representative, his immediate supervisor and to CSA.
*GRIEVANCES INITIATED BY CSA*
CSA may initiate a grievance as defined in paragraph A 1 b above at the level of a district superintendent, an assistant superintendent or the Chancellor as may be appropriate.
C. *ARBITRATION*
A grievance which has not been resolved at the level of the Chancellor may be submitted to an arbitrator.
A grievance may not be submitted to an arbitrator unless a decision has been rendered by the Chancellor under the grievance

Note 4—Continued

procedure, except in cases where, upon expiration of the twenty-day time limit for decision, the aggrieved supervisor or CSA filed notice with the Chancellor of intention to submit the grievance to arbitration and no decision was issued by the Chancellor within twenty school days after receipt of such notice. The supervisor may proceed personally or through CSA or any other representative of his choice. Where the supervisor is not represented by CSA, CSA shall be given timely notice of the submission to arbitration and CSA shall be permitted to submit its views to the arbitrator.

The proceeding may be initiated by filing with the Board and the American Arbitration Association a notice of arbitration. The notice shall be filed within ten school days after receipt of the decision of the Chancellor or, where no decision has been issued in the circumstance described above, within three days following the expiration of the twenty-day period provided above. The notice shall include a brief statement setting forth precisely the issue to be decided by the arbitrator and the specific provision of the agreement involved.

The American Arbitration Association shall appoint one of a panel of three arbitrators to be designated by mutual agreement of the parties, to serve in rotation for any case or cases submitted.

The voluntary labor arbitration rules of the American Arbitration Association shall apply to the proceeding insofar as they relate to the selection of the arbitrator, the hearings and fees and expenses.

The arbitrator shall issue his decision not later than 30 days from the date of the closing of the hearings or, if oral hearings have been waived, then from the date of transmitting the final statements and proofs to the arbitrator. The decision shall be in writing and shall set forth the arbitrator's opinion and conclusions on the issues submitted. The arbitrator shall limit his decision strictly to the application and interpretation of the provisions of this agreement and he shall be without power or authority to make any decision:

1. Contrary to, or inconsistent with, or modifying or varying in any way, the terms of this agreement or of applicable law or rules or regulations having the force and effect of law;

2. Involving Board discretion or Board policy under the provisions of this agreement, under Board by-laws or under applicable law, except that he may decide in a particular case that Board policy was disregarded or that its attempted application under any term of this agreement was so

discriminatory, arbitrary, or capricious as to constitute an abuse of discretion.

3. Limiting or interfering in any way with the powers, duties, and responsibilities of the Board under its by-laws, applicable law and rules and regulations having the force and effect of the law.

The decision of the arbitrator shall be in writing and, if made in accordance with his jurisdiction and authority under this agreement, shall be advisory only and not binding upon the Board.

The Board shall make a final determination within 30 days after receipt of the arbitrator's decision.

The arbitrator's fee will be shared equally by the parties to the dispute.

\* \* \* \* \*

ARTICLE XI
SPECIAL COMPLAINTS

It is the declared objective of the parties to encourage the prompt and informal resolution of special complaints not covered by the Grievance Procedure and to dispose of such complaints as they arise and to provide recourse to orderly procedures for their adjustment.

A. *DEFINITION*

A "special complaint" is a complaint by a supervisor that a person or persons or groups are engaging in a course of harassing conduct, or in acts of intimidation, which are being directed against him in the course of his employment, and that the principal of the school in which he is assigned or the District Superintendent of the district in which he is employed or the appropriate Assistant Superintendent at the high school level has not afforded the supervisor adequate relief against such course of conduct or acts of intimidation.

B. *FILING AND PRIORITY HANDLING*

A special complaint shall be promptly filed with the Chancellor by the affected employee or, upon his request, by CSA. Such complaint shall receive expedited handling pursuant to this Article.

C. *JOINT INVESTIGATION AND INFORMAL RESOLUTION*

Within twenty-four (24) hours after the special complaint is filed with the Chancellor, a "Joint" Investigating Committee consisting of one representative designated by the Chancellor and one representative designated by CSA shall investigate the complaint at the school or district level to ascertain the facts and bring about a prompt resolution of the problem without resort to formal procedures. In the course of its investigation, the Joint Committee shall confer with the principal of the school, the Chancellor and other persons involved in the controversy.

not long detain us, since it deals only with violations of the CSA contract. While this section may therefore afford relief for some of the individual acts complained of—such as the unauthorized disclosures of plaintiff's personal file— type of systematic harassment that is it does not even purport to deal with the the gravamen of the instant action.

Article XI, on the other hand, at least purports to deal with "harassing conduct" or "acts of intimidation." It sets up an expedited procedure for the resolution of what are called "special complaints." These are defined as Complaints:

> "by a supervisor that a person or persons or groups are engaging in a course of harassing conduct, or in acts of intimidation, which are being directed against him in the course of his employment, and that . . .

the District Superintendent of the district in which he is employed . . . has not afforded the supervisor adequate relief against such course of conduct or acts of intimidation."

Such complaints are filed directly with the Chancellor, who before holding a hearing personally, appoints a "Joint" Investigating Committee to look into the matter. If neither the Committee nor the Chancellor can resolve the dispute, the complaint can be submitted for hearing and fact-finding before an arbitrator or "fact-finder". The fact-finder, however, must "limit his findings strictly to the question whether the employee's complaint has been substantiated by the evidence;" and he is specifically denied any of the "powers conferred upon trial examiners pursuant to Section 2590–j 7(f) of the Education

**D.** *ADMINISTRATIVE HEARING AND CONTINUED ATTEMPT AT INFORMAL RESOLUTION*

If the complaint is not resolved by the Joint Investigating Committee to the satisfaction of the affected supervisor he may request a hearing before the Chancellor. Within forty-eight (48) hours after receipt of the request for hearing, the Chancellor, or a representative designated by him, shall hold a hearing at which the Joint Investigating Committee shall report its findings and all persons involved, including the affected supervisor, shall have an opportunity to be heard. The complaining supervisor may represent himself at the hearing or, upon request, may be represented by CSA or by a person of his own choosing other than an attorney.

At the hearing the Chancellor, or his representative shall make every effort to resolve the complaint informally and all persons involved shall cooperate toward this end.

**E.** *DECISION OF THE CHANCELLOR*

Within seventy-two (72) hours following the close of the hearing, the Chancellor shall notify all parties of his decision and the manner in which it shall be effectuated.

**F.** *FACT FINDING AND RECOMMENDATIONS*

If the complaint is not resolved by the Chancellor, the affected supervisor, or CSA upon his request, may submit it for hearing and fact finding before an arbitrator selected in accordance with Article XC of this Agreement. The submission shall be made within ten (10) school days after the issuance of the Chancellor's decision.

The voluntary labor rules of the American Arbitration Association shall apply to the proceeding in so far as they relate to the hearing, fees and expenses.

The fact-finder shall render findings not later than seventy-two (72) hours from the date of the close of the hearings or, if oral hearings have been waived then from the date of transmitting the final statements and proofs to the fact-finder. The findings of fact shall be in writing. The fact-finder shall limit his findings strictly to the question whether the employee's complaint has been substantiated by the evidence. If the fact-finder finds the complaint to be substantiated and unremedied, he shall recommend an appropriate remedy.

The fact-finder shall not interpret or apply the provisions of this Agreement or exercise any of the other functions specified in Article X of this agreement, nor shall he exercise any of the powers conferred upon trial examiners pursuant to Section 2590–j, 7(f) of the Education Law [McKinney's Consol. Laws, c. 16].

*BOARD CONSIDERATION*

Within ten (10) days after receipt of the fact finder's report, the Board shall make a determination."

Law." [5]  The fact-finder can recommend an appropriate remedy, but the decision whether to apply such remedy is left to the Board of Education.

In addition to the above contractual remedies, there is a state administrative remedy available to the plaintiff. Section 310 of the Education Law, McKinney's Consol.Laws of N.Y., c. 16, 1969,[6] permits an appeal to the Commissioner of Education from decisions of the City Board of Education. Thus, this remedy would come into play if plaintiff invoked his contractual grievance and special complaint procedures and there-after remained unsatisfied with the Board's final determination.

Before turning to the merits of the defendants' argument, it would do well briefly to review the law in this Circuit with respect to the exhaustion requirement. Just recently, the Court of Appeals reaffirmed, "albeit with some hesitation," its rule that adequate state administrative remedies be exhausted prior to bringing an action under the Civil Rights statutes. *Fuentes v. Roher* (2d Cir. 1975), 519 F.2d 379. Supreme Court cases seeming to cast doubt on this requirement [7] have been interpreted

---

5. § 2590–j 7(f):

"(f) The community board on receipt of a notice of charges by the community superintendent against any employee shall appoint one or more trial examiners. The assigned trial examiner or examiners shall be selected from a panel of competent persons maintained by the chancellor. The trial examiner shall administer the oath to all appropriate witnesses. A trial examiner shall have the power to subpoena witnesses, papers and records. The provisions of the civil practice law and rules in relation to enforcing obedience to a subpoena lawfully issued by a judge, arbitrator, referee or other person in a matter not arising in an action in a court of record apply to a subpoena issued by a trial examiner as authorized by this subdivision. The report of any such trial examiner shall be subject to final action by the community board. The community board may reject, confirm or modify the report of the trial examiner or examiners. A vote of the majority of all members of the board shall be necessary for a finding of guilt and to impose a penalty or punishment. The employee may appeal to the city board from any adverse determination or penalty imposed by such community board. The city board after reviewing the record in the case, shall have the power to make a final determination in the case subject to any provision for arbitration that may exist in agreements between the city board and the organization representing such employee, not inconsistent with applicable law. Nothing contained in this section shall preclude an aggrieved employee from seeking a review of such final determination by the commissioner or the courts as prescribed by law.

6. Section 310 of the Education Law:
"Appeals or petitions to commissioner of education and other proceedings

Any person conceiving himself aggrieved may appeal or petition to the commissioner of education who is hereby authorized and required to examine and decide the same; and the commissioner of education may also institute such proceedings as are authorized under this article and his decision in such appeals, petitions or proceedings shall be final and conclusive, and not subject to question or review in any place or court whatever. Such appeal or petition may be made in consequence of any action:

1. By any school district meeting.
2. By any district superintendent and other officers, in forming or altering, or refusing to form or alter, any school district, or in refusing to apportion any school moneys to any such district or part of a district.
3. By a county treasurer or other distributing agent in refusing to pay any such moneys to any such district.
4. By the trustees of any district in paying or refusing to pay any teacher, or in refusing to admit any scholar gratuitously into any school or on any other matter upon which they may or do officially act.
5. By any trustees of any school library concerning such library, or the books therein, or the use of such books.
6. By any district meeting in relation to the library or any other matter pertaining to the affairs of the district.
7. By any other official act or decision of any officer, school authorities, or meetings concerning any other matter under this chapter, or any other act pertaining to common schools."

7. *McNeese v. Board of Education* (1963), 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622; *Damico v. California* (1967), 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647; *King v. Smith* (1968), 392 U.S. 309, 312 n. 4, 88 S.Ct.

in *Eisen v. Eastmen* (2d Cir. 1969), 421 F.2d 560, *cert. denied*, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 and in *Blanton v. State University of New York* (2d Cir. 1973), 489 F.2d 377, " 'as simply condemning a wooden application of the exhaustion doctrine in cases under the Civil Rights Act.' " 489 F.2d at 383, quoting 421 F.2d at 569. See, also *Fuentes v. Roher, supra,* at 386.

■ There are, however, important qualifications to the exhaustion rule. One such exception, mentioned in *Fuentes v. Roher, supra,* comes into play where the question of the adequacy of the administrative remedy is for all practical purposes coextensive with the merits of plaintiff's constitutional claims. In addition, the Second Circuit does not require exhaustion of state administrative remedies where their pursuit is either futile or inadequate. *Plano v. Baker* (2d Cir. 1974) 504 F.2d 595. In *Plano,* for example, the court explicitly held that exhaustion would not be required where the remedy afforded was solely under Section 310 of the Education Law—the same administrative procedure invoked here. The court stated that the administrative procedure under that section was inadequate to resolve factual disputes, noting that the regulations governing appeals to the Commissioner make oral argument discretionary and expressly prohibit the taking of testimony. 504 F.2d at 598.

It is thus apparent that—since the instant dispute like the one in *Plano* is largely factual in nature—if Section 310 were the only remedy available to plaintiff, exhaustion of this administrative remedy would not be required. The defendants, however, argue that if the available contractual remedies are considered in conjunction with Section 310, the defects in the administrative remedy's fact-finding procedure will be cured. They urge that this entire panoply of contractual and administrative remedies, treated as a whole, are adequate to resolve the issues raised in plaintiff's complaint.

■ We disagree. First, in view of the hesitancy with which this Circuit clings to the exhaustion of administrative remedies doctrine, we find no basis for extending the principle to the type of contractual remedies here involved. Indeed, we feel that the relevant authorities preclude such extension.

*Alexander v. Gardner-Denver Company* (1974) 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147, although not dealing with the precise issue, is clearly relevant. In that case the question was raised whether an employee's invocation of a grievance procedure provided in a collective bargaining agreement waived the employee's cause of action under Title VII of the Civil Rights Act of 1964. After a full discussion of the unsuitability of grievance and arbitral proceedings for the resolution of statutory or constitutional issues,[8] Mr. Justice Powell, writing for a unanimous Court, held that the employee's Title VII rights had not been

2128, 20 L.Ed.2d 1118; *Houghton v. Shafer* (1968), 392 U.S. 639, 88 S.Ct. 2119, 20 L. Ed.2d 1319; *Wilwording v. Swenson* (1971), 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418; *Carter v. Stanton* (1972), 405 U.S. 669, 92 S.Ct. 1332, 31 L.Ed.2d 593; *Gibson v. Berryhill* (1973), 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488.

See also *Steffel v. Thompson* (1974), 415 U.S. 452, 472–73, 94 S.Ct. 1209, 39 L.Ed.2d 505.

8. 415 U.S. at 56–58, 94 S.Ct. at 1024:
"Arbitral procedures, while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII. This conclusion rests first on the special role of the arbitrator, whose task is to effectuate the intent of the parties rather than the requirements of enacted legislation. Where the collective-bargaining agreement conflicts with Title VII, the arbitration must follow the agreement. To be sure, the tension between contractual and statutory objectives may be mitigated where a collective-bargaining agreement contains provisions facially similar to those of Title VII. But other facts may still render arbitral processes comparatively inferior to judicial processes in the protection of Title VII rights. Among these is the fact

waived. Moreover, the language of the opinion appears to indicate that had plaintiff not invoked his remedies under the collective bargaining agreement, he would not have been turned away for failure to exhaust contractual remedies. See, *Waters v. Wisconsin Steel Works of Int. Harvester Co.* (7th Cir. 1974), 502 F.2d 1309, 1316, U.S.App.Pending; *Thornton v. East Texas Motor Freight* (6th Cir. 1974), 497 F.2d 416, 426; *Hardison v. Trans World Airlines* (W. D.Mo.1974), 375 F.Supp. 877, 880. See, also, *Rios v. Reynolds Metals Company* (5th Cir. 1972), 467 F.2d 54, 57.

It seems to us that *Alexander* also precludes any requirement that purely contractual remedies be exhausted in civil rights actions brought under sections other than Title VII, such as 42 U.S.C. § 1981, § 1983, § 1985 or § 1986. Congress in enacting these civil rights provisions has "long evinced a general intent to accord parallel or overlapping remedies against discrimination." (*Alexander* at 47, 94 S.Ct. at 1019).

Defendants rely on the Second Circuit's decision in *Fuentes v. Roher, supra,* for the proposition that a plaintiff must exhaust contractual remedies. This reliance, however, is misplaced. While, as a technical matter, the remedies Fuentes was required to exhaust had been established by contract, the contract in question specifically embodied the very due process provisions provided by the State Education Law. Thus, the Court of Appeals observed (at 383):

"Fuentes was thus given by contract the procedural protections afforded tenured teachers and supervisors. These include rights to notice, retained counsel, the opportunity to call and to cross-examine witnesses . . . ."

The contract involved in the instant action, on the other hand, makes no reference whatever to the general due process provisions of the Education Law, and, as we have seen, specifically prohibits invocation of Section 2590–j, subd. 7(f), the section which allows a trial examiner to administer oaths and subpoena witnesses and documents.

The woefully inadequate procedures available to plaintiff in this case demonstrate the wisdom of a rule not requiring the exhaustion of contractual remedies which are totally independent of any state administrative procedure.

As we noted above, the Article X grievance procedure is irrelevant, dealing, as it does, exclusively with the interpretation and application of the CSA contract. The procedures under Article XI in no way guarantee either accurate fact-finding or the satisfactory resolution of constitutional claims. The preliminary stages of this procedure contain significant infirmities. For example, when a complaint is first filed with

that the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land. . . . Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations. On the other hand, the resolution of statutory or constitutional issues is a primary responsibility of courts, and judicial construction has proved especially necessary with respect to Title VII, whose broad language frequently can be given meaning only by reference to public law concepts.
Moreover, the factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable. . . . And as this Court has recognized, '[a]rbitrators have no obligation to the court to give their reasons for an award.' *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U. S. 593 at 598 [80 S.Ct. 1358, at 1361, 4 L.Ed.2d 1424]. Indeed, it is the informality of arbitral procedure that enables it to function as an efficient, inexpensive, and expeditious means for dispute resolution. This same characteristic, however, makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts." (citations and footnotes omitted)

the Chancellor—who, it should be reemphasized, is a defendant in this action—he appoints a joint investigating committee which consists of a representative designated by the Chancellor and a representative, not designated by the complainant, but rather by the CSA, the exclusive collective bargaining representative for supervisory employees. It is clear, however, that the interests of this organization may be inimical to that of plaintiff's. Indeed, plaintiff contends that the CSA in the last School Board election in District No. 1 vigorously supported the slate of candidates put forward by the UFT and that the CSA in general has been anti-Puerto Rican.[9]

At the hearing before the Chancellor, the next stage in the remedy procedure under Article XI, this "joint" committee reports its findings and although the complainant does have an opportunity to be heard, he is expressly prohibited from having the assistance of an attorney.

Finally, if the joint committee and/or the Chancellor are unable to resolve the dispute, the matter then may be submitted to arbitration. We have already commented on the various restrictions that the contract imposes on the fact-finding process pursuant to this provision. We here note that these procedural defects are especially significant when one considers the scope and breadth of the constitutional issues, particularly in the First and Fourteenth Amendment areas, that must be resolved in this case. It is clear that such issues properly lie within the expertise of the courts, and not within the special competence of an arbitrator who is more concerned with the law of the shop than the law of the land. See *Alexander v. Gardner-Denver Company, supra,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147. Moreover, whatever guidance, if any, such an arbitrator could give the court on these constitutional issues, would be clearly limited by the inadequate fact-finding procedures available. See *Plano v. Baker, supra,* 504 F.2d 599.

## B. *Sufficiency of the Pleadings*

■ Certain of the defendants, primarily the UFT defendants, Chancellor Anker, and the individual members of the Board of Education, urge that the complaint be dismissed as to them because of plaintiff's failure to allege specific facts.

After carefully reviewing the complaint, it seems clear that this motion must be denied. Although it may well be that plaintiff will be unable to prove all—or even any—of his allegations, "a case brought under the Civil Rights Act should not be dismissed at the pleadings stage unless it appears 'to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim.'" *Holmes v. New York City Housing Authority* (2d Cir. 1968), 398 F.2d 262, 265. See, also, *Conley v. Gibson* (1957), 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80. In this case, the plaintiff has set forth facts showing intentional and purposeful deprivation of his civil rights, and has alleged with at least some degree of particularity overt acts by the defendants which he claims were reasonably related to the promotion of the claimed conspiracy. Such a showing is sufficient to withstand a motion to dismiss pursuant to Rule 12(b)(6). See *Griffin v. Breckenridge* (1971) 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338; cf. *Powell v. Workmen's Compensation Board of the State of New York* (2d Cir. 1964) 327 F.2d 131.

■ The UFT defendants further maintain that even if plaintiff has stated a sufficient cause of action under 42 U.S.C. § 1983, they, as non-official defendants, would not fall within the ambit of the statute. It is, however, well established that private parties, who act in conjunction with state officials, can be liable under 42 U.S.C. § 1983, although they themselves are not officials of the state. *Adickes v. Kress & Co.* (1970) 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142; *Shirley v. State National Bank of Connecticut* (2d Cir. 1974) 493

9. See plaintiff's Affidavit in opposition to motion to dismiss.

869

F.2d 739, *cert. denied,* 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284. Plaintiff's complaint clearly alleges that the UFT defendants engaged in concerted, inter-related activity with the various governmental defendants. Thus, plaintiff's action against the UFT defendants under 42 U.S.C. § 1983 is properly before the court.

## Conclusion

In summary, the defendants' motions to dismiss the complaint are in all respects denied. In view, however, of the importance of this litigation and its close relationship to previous litigation recently before the Court of Appeals, it seems that such court should have an opportunity, if it wishes, to consider whether we have correctly interpreted its mandate in *Fuentes v. Roher, supra.* Accordingly, this court certifies pursuant to 28 U.S.C. §. 1292(b) that the question whether plaintiff should be required to exhaust remedies is a controlling question of law as to which there may be substantial ground for difference of opinion the immediate resolution of which may materially advance the ultimate resolution of this litigation.

So ordered.