WALTER A. GORMAN et al., Respondents, *v.* CITY OF NEW YORK et al., Appellants.

First Department, March 11, 1952.

*W. Bernard Richland* of counsel (*Pauline K. Berger* with him on the brief; *Denis M. Hurley, Corporation Counsel,* attorney), for appellants.

*James H. Tully* of counsel (*Truman H. Luhrman* and *Edward J. McGowan* with him on the brief; *Wood, Molloy, France & Tully,* attorneys), for respondents.

*Richard G. Denzer* of counsel (*Charles W. Manning* with him on the brief; *Frank S. Hogan, District Attorney, New York County*), *amicus curiæ* for appellants.

*Aaron Nussbaum* of counsel (*Aaron E. Koota* with him on the brief; *Miles F. McDonald, District Attorney, Kings County*), *amicus curiæ* for appellants.

*David Du Vivier* of counsel (*W. Mason Smith, Jr.,* with him on the brief; *The Committee on Municipal Affairs of The Association of the Bar of the City of New York*), *amicus curiæ* for appellants.

*Samuel D. Smoleff* of counsel (*Laurence Arnold Tanzer* and attorney), for The Citizens Union of the City of New York, *amicus curiæ* for appellants.

BERGAN, J.   Plaintiffs are policemen and members of the police pension system of the city of New York.   The action is maintained against the city and the members of its police pension fund for a judgment declaring Local Law No. 44 of 1951 invalid on constitutional grounds.

The local law in effect requires a notice of thirty days be given by a policeman who has served the required number of years before his election to retire on pension becomes effective. The retirement of such a policeman had formerly been effective immediately upon his election.

The constitutional validity of the statute is attacked by plaintiffs on the ground that the city was without power to enact such a local law; and, even if it had the power of enactment the law would nevertheless be invalid because it is in conflict with another constitutional provision that membership in a pension system is a contractual relationship, the benefits of which cannot be impaired.   (N. Y. Const., art. IX, § 12; art. V, § 7.)   The court at Special Term was of opinion that the views of the plaintiffs on these questions were correct and denied defendants' motion for judgment.

We address ourselves first to the power of the city to enact the local law of 1951.   The statute governing the manner of retirement of policemen as it read at the time of this enactment provided in terms that a policeman who had served either of the alternative periods of time specified " shall be retired " upon his " own application in writing ".

The statute had been enacted in this form by the city of New York as Local Law No. 2 of 1940.   It became a law February 13, 1940, and it undertook to amend the Administrative Code in relation to the police pension fund " generally."   The statute provided for many changes and dealt in one way or another with fifty-seven pertinent sections of the Administrative Code.

In the same year the Legislature also undertook to deal additionally with the local law that had thus been enacted by the city.   By section 2 of chapter 437 of the Laws of 1940, effective April 1st, the Legislature enacted that " Notwithstanding any defect, irregularity or omission " of " any lawful requirement " or lack " of statutory authority " the " acts and proceedings " of the city's legislative body in enacting Local Law No. 2 " are hereby legalized and validated."

It is argued by the plaintiffs that this enactment to which the generic term "curative statute" has sometimes been given judicially (*Matter of Tartaglia* v. *McLaughlin,* 297 N. Y. 419, 425) is such a "law enacted by the legislature" relating to a pension or retirement system that the city was without power to alter its own underlying local statute (N. Y. Const., art. IX, § 12). The Constitution there excepts from the general legislative power of a city to amend State laws those relating to a pension system enacted on emergency message from the Governor.

Curative or validating statutes had genesis in a purpose to overcome doubts about certain kinds of local public, and even private, proceedings and determinations. A good example is the resolution of the Suffolk supervisors in 1934 relating to tax warrants said to have lacked legal authorization, which was validated during the pendency of an attack through judicial proceedings, by a "curative statute". (*Bradford* v. *County of Suffolk,* 283 N. Y. 503.)

The practice has been extended to the validation of local laws "even if the local law in itself was not a legitimate exercise of city power" (*Matter of Tartaglia* v. *McLaughlin, supra,* p. 424). There the curative statute itself was examined as to its own constitutional validity and the court was of opinion that it was "undoubtedly valid" (p. 425).

No court has said that a legislative approval or validation of a local law lifts the local law thereafter into a plane beyond the reach of local legislative power. It is reasonable to suppose, both from the character of the soil which has nourished the growth of New York's "curative statutes" and from the language which the Legislature used in the enactment of this particular one, that no intention existed either to supersede what the city's legislative body had done or for the State to occupy the field of local regulation of a local matter. The intent was to add tensile strength to an existing statutory structure to satisfy minds that might be apprehensive of some theoretical weakness.

The interpretation of this statute is to be arrived at in the customary way by looking at its language. The curative statute of 1940 so far as it is addressed to this local law does not deal with pensions explicitly. It deals with the "acts and proceedings" of the city in pursuing its legislative power. It provides that if there be "any" legal infirmity in the city's enactment of its local law the defect is made good.

If the enactment of the local law was on sound ground it is manifest from what the Legislature said that the act of validation was not intended to weaken the ground. It certainly was not designed to affect adversely a valid local law. The Legislature was dealing with the contingency that the local law might in some indefinite sense be held by a court to be invalid and the legislative power of the State was being added to that of the city against such a contingency.

It would grossly distort the intent of the Legislature, as expressed in the language used, to suppose that its statute not only operated adversely against the force of a valid local law, but that it so operated as to diminish the power of the local legislative body thereafter to amend its own statute.

The local law of 1951 neither referred to nor affected in any way what the Legislature had done by its " curative statute ". It amended the 1940 local law by what the title says is " A local law to amend the administrative code of the city of New York ".

We conclude, therefore, that the curative statute of 1940 was what its term implies, a statute to be called into effect as a prop against infirmity and that it did not place beyond the power of the city the right to amend the local law to which it referred within the constitutional prohibition against local legislative action superseding a State law relating to a pension.

Even if the State law could be regarded as itself a pension act of the Legislature and not merely a " curative statute ", it was not an emergency law within the definition of section 12 of article IX of the Constitution, to which the exception upon local legislative power stated in that section applies.

When all the language of this constitutional section is read together, the exception which contains the limitation is so placed in context in relation to the grant of local power to deal with emergency State laws that the limitation, too, must be deemed related to this kind of State law, i.e., one enacted on emergency message, and chapter 437 of the Laws of 1940 is not one of these.

The Constitutional Convention of 1938 seems to have had this view of what it was doing, and appellants have fully demonstrated that the cities of the State have quite generally felt themselves competent by local laws to deal with pension statutes of the Legislature in the exercise of what they deemed their constitutional powers since 1938. The cumulative effect of these practical constructions of constitutional power has a very considerable force. We hold the city was vested with legislative power to amend in 1951 its own pension statute of 1940.

We turn, then, to another side of the constitutional argument. Even if we sustain the legislative power of the city to enact the statute, plaintiffs contend that it is invalid because it penetrates the wall of protection thrown around membership in a pension system by section 7 of article V of the Constitution.

The essential language of this constitutional provision is that "membership in" a pension system is a "contractual relationship" and that the "benefits" of the relationship shall not be "diminished or impaired."

The statute here under attack does not change the length of police service required for eligibility for pension benefits. A thirty-day notice to the city that the member desires to be pensioned at a time when he will be eligible is the direction of the amended statute.

The member is free to serve the notice thirty days before he becomes eligible and his pension begins on the very day of eligibility. If the beginning point of eligibility goes by without notice of election to take his pension, this has been because the member himself has let it go by.

No compulsion of the statute brings about this. The time at which a member becomes eligible to be pensioned is not postponed by the law of 1951 unless the police member himself extends it by failing to give notice that he will take his pension at the earliest time of eligibility.

With the date of the inception of pension not postponed except where the police member postpones it, it makes a fairly tenuous argument to say that the "benefits" of "membership" have been "diminished or impaired" by the requirement of this local law for a thirty-day notice.

And, of course, if the police member had it in his control in the first place to take his pension as soon as eligible the continuance of the requirement for a thirty-day notice is not a diminution or impairment of the benefits of membership in the sense these protective words were used in the Constitution.

The further provision in the local law of 1951 that at the time the police member's application for pension becomes effective his place in the police force shall not have "terminated or have been forfeited" is not on any possible theory open to the construction that it is an impairment or diminution of a pension right, for, of course, the Constitution contemplates a public employment which validly continues until the right to be pensioned matures and it does not imply a restriction upon public authority to remove a member from a public position

for valid cause, even though the right to a pension terminates with the removal.

The contractual nature of membership in a pension system does not also freeze public employment into unchangeable status. That a member's benefits in a pension system may not constitutionally be impaired does not also give him a constitutional right to stay in public employment. To do this would place the regulation of public employment beyond the control of any authority, and the New York Constitution cannot be read in this sense.

Public regulation may interpose itself to alter the method of conditions of the enforcement of contractual rights without necessarily impairing, in the constitutional sense, the obligation of the contract. (*Conley* v. *Barton*, 260 U. S. 677.) There a statute imposed a certain procedural burden on a mortgagee if he was to sustain a foreclosure which had not existed when the mortgage was taken. The court was of opinion this new burden did not impair the obligation of the contract.

There is, too, a fairly well-marked line of separation between the power of government to regulate public employment unfettered by contractual title in the office, and the contractual rights which when matured, as an earned salary, are an incident to public employment. The principle has often been stated, but never more incisively than it was a century ago by Chief Judge RUGGLES in *Conner* v. *Mayor of City of New York* (5 N. Y. 285 [1851]).

The county clerk had been entitled by law to the fees of the office. After the election of Conner as clerk of New York County he had collected the fees, but during his term the Legislature directed that all fees should thereafter belong to the city and the clerk be paid a salary. Notwithstanding the reasonable expectation of the clerk when elected that he would receive the fees for the rest of his term, the impairment of this prospect was not regarded by the court as taking away property in the constitutional sense. " Public offices in this state ", remarked the Chief Judge, " are not incorporeal hereditaments " (p. 295).

This separability of contract rights and rights in respect of the regulation of government is apparent too in *People ex rel. Squires* v. *Hand* (158 App. Div. 510) which held that the colonial charters in Southampton could not be affected in respect of property rights granted, but even as an incident to the control of the property could not freeze the legislative power of the State to prevent the revision and rearrangement of the local government of the town.

In the same spirit the ultimate right to a pension does not adversely affect the right of the State to abolish a public office upon the continuance of which a pension depends (*People ex rel. Devery* v. *Coler,* 173 N. Y. 103); or to change a salary which affects the amount of a pension (*Hoar* v. *City of Yonkers,* 295 N. Y. 274). The last case was decided with the constitutional protection of 1938 in mind.

The local law of 1951 requiring the giving of reasonable notice before retirement becomes effective is in its main operative effect a reasonable regulation by the city of the conditions of public employment. It would seem especially important in the case of policemen to allow the city the benefit of a short time between the decision of the member to retire on pension and the termination of his service.

It is not difficult to envisage resignations on pension in numbers and at times which could create acute public danger. The nature of the work a policeman does, its close relation to public safety, the emergent and unpredictable nature of the task of preserving the order of the community, all point to the need for timely notice of retirement from service and opportunity to adjust to retirements as they come. It would take very implicit and forbidding constitutional language to deprive local government of the pertinent legislative power to deal freely with the conditions of this kind of employment.

The plaintiffs in their complaint have added to their basic constitutional attack upon the validity of the local law an attack upon the motivation of the city in its enactment. If the legislative power is found to exist and to have been exercised without affecting adversely constitutional rights, that finding usually is regarded as the terminal point of judicial inquiry.

The complaint alleges that the purpose of the city to impair the contractual rights of the plaintiffs is manifest from the statements of district attorneys and others leading to the enactment of the local law of 1951 that the right to immediate retirement on pension frustrated the inquiries of grand juries. The honest policeman will not object to a reasonable delay in allowing his pension under the limited circumstances we have discussed if his official acts as a policeman are the subject of a grand jury inquiry; as to the dishonest policeman, when he has had his constitutional rights protected he has had enough. We are of opinion that the statute is valid. The declaration in the judgment should have been for the defendants since no triable issue of fact is suggested. (*German Masonic Temple Assn.* v.

*City of New York,* 279 N. Y. 452.) Our determination is of course limited to the state of facts presented in the. complaint before us.

The order of the Special Term should be reversed, with $20 costs and disbursements to appellants, and the motion of the defendants for a declaratory judgment on the conceded facts of the complaint granted, with costs.

PECK, P. J., DORE, COHN. and SHIENTAG, JJ., concur.

Order unanimously reversed, with $20 costs and disbursements to the appellants, and the motion of the defendants for a declaratory judgment on the conceded facts of the complaint granted, with costs. Settle order on notice.