Emil TRON, Individually, and as President of Association of Retired Teachers of the City of New York, Inc., on behalf of retired teachers of the City of New York, Plaintiff,

v.

Victor F. CONDELLO et al., Defendants.

No. 76 Civ. 567 (WCC).

United States District Court,
S. D. New York.

Dec. 23, 1976.

Beauduy, Schramek & Hay, New York City, for plaintiff; Harold F. Hay, New York City, of counsel.

W. Bernard Richland, Corp. Counsel, New York City, for defendants: Teachers' Retirement Board, its Members; Comptroller Goldin and The City of New York; James G. Greilsheimer, Judith A. Levitt, Allen F. London, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant, The Municipal Assistance Corporation for The City of New York; Martin Kleinbard, Max Gitter, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., New York City, for defendants, New York State Emergency Financial Control Board; Comptroller Arthur Levitt; Samuel A. Hirshowitz, Shirley Adelson Siegel, New York City, of counsel.

CONNER, District Judge.

■ This action challenging investment of New York City Teachers' Retirement funds in obligations of the Municipal Assistance Corporation for The City of New York (MAC) is before this Court on motions by defendants, pursuant to Rules 12(b)(1) or 12(b)(6), F.R.Civ.P., to dismiss both of plaintiff's claims for relief. For purposes of these motions, we are required to treat the factual allegations of the complaint as true, *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), so the facts stated below either are undisputed or are taken from the complaint.

## I.

Plaintiff Emil Tron was employed as a teacher by the Board of Education of the City of New York until 1967, when he retired. During his employment, he contributed to the Teachers' Retirement System of the City of New York (the Retirement System) by means of payroll deductions. Since his retirement, he has been receiving a retirement allowance from defendant Teachers' Retirement Board of the City of New York (the Retirement Board), pursuant to provisions of Chapter 20 of the Administrative Code of the City of New York. Defendants Victor Condello, James Regan, Isaiah Robinson, Harrison Goldin, Reuben Mitchell, Bernard Goldberg and Joseph Shannon are the individual members of the Retirement Board.

Tron is President of the Association of Retired Teachers of the City of New York, whose members have retired from employment by the Board of Education of the City of New York and the Board of Higher Education of the City of New York and, like plaintiff, receive retirement allowances from the Retirement Board. Plaintiff seeks to bring this action individually, as President of the Association, and as a class action on behalf of all retired teachers of the City of New York.

In the first in a series of special enactments designed to respond to New York City's financial crisis, the New York State Legislature created defendant MAC in June 1975, as "a corporate governmental agency and instrumentality of the state constituting a public benefit corporation", N.Y.Pub. Auth.Law § 3033(1) (McKinney's 1975 Supp.), "to assist the city of New York in providing essential services to its inhabitants without interruption and in creating investor confidence in the soundness of the obligations of such city". *Id.* at § 3031. MAC was initially authorized to issue up to three billion dollars in notes and bonds, N.Y.Pub.Auth.Law § 3033 (McKinney's 1975 Supp.); this was later increased to five billion, two hundred fifty million dollars, L.1975, ch. 891, § 1. It was also authorized to purchase and make exchanges for short term obligations of defendant City of New York. N.Y.Pub.Auth.Law §§ 3035, 3037 (McKinney's 1975 Supp.). MAC bonds are not backed by the faith and credit of the State or of the City, but by the proceeds of stock transfer and sales taxes collected within New York City by the state government, upon annual appropriations by the State Legislature.

The next step in the financial recovery program was the New York State Financial Emergency Act for the City of New York (Emergency Act), L.1975, chs. 868–70, passed by an extraordinary session of the State Legislature on September 9, 1975. The preamble set forth extensive findings of fact as to the emergency situation:

"It is hereby found and declared that a financial emergency and an emergency period exists in the city of New York. The city is unable to obtain the funds needed by the city to continue to provide essential services to its inhabitants or to meet its obligations to the holders of outstanding securities. Unless such funds are obtained the city will soon (i) fail to pay salaries and wages to employees and amounts owed vendors and suppliers to the city, (ii) fail to pay amounts due to persons receiving assistance from the city and (iii) default on the interest and principal payments due the holders of outstanding obligations of the city.

"If such failures and defaults were to occur, the effect on the city and its inhab-

itants would be devastating: (1) unpaid employees might refuse to work; (2) unpaid vendors and suppliers might refuse to sell their goods and render services to the city; (3) unpaid recipients of public assistance would be unable to provide themselves with the basic necessities of life; and (4) unpaid holders of city obligations would seek judicial enforcement of their legal rights as to city revenues. These events would effectively force the city to stop operating as a viable governmental entity and create a clear and present danger to the health, safety and welfare of its inhabitants.

"The difficulties of finding solutions to such events would be compounded by the likelihood that the city, as well as the municipal assistance corporation for the city of New York, would be foreclosed from seeking funds in the public markets. The elimination of the public markets as a source of funds would leave the city with no foreseeable way to refund its outstanding short-term indebtedness. Thus, the city might be unable for an extended period to cure defaults on its outstanding obligations and that event could almost permanently destroy the fiber of the city.

\* \* \* \* \* \*

"This situation is a disaster and creates a state of emergency. To end this disaster, to bring the emergency under control and to respond to the overriding state concern described above, the state must undertake an extraordinary exercise of its police and emergency powers under the state constitution, and exercise controls and supervision over the financial affairs of the city of New York, but in a manner intended to preserve the ability of city officials to determine programs and expenditure priorities within available financial resources." L.1975, ch. 868, § 1.

The Emergency Act created defendant New York State Emergency Control Board (Emergency Control Board), "a governmen-

tal agency and instrumentality of the state", L.1975, ch. 868, § 2 (§ 5), composed of the Governor, three gubernatorial appointees, the New York City Mayor, the New York City Comptroller (defendant Arthur Levitt). L.1975, ch. 869, § 1. The Emergency Control Board was given significant supervisory powers over all aspects of New York City's finances, see L.1975, ch. 868, § 2 (§ 7), and was required to develop, in conjunction with City officials, a three-year plan to restore the City's fiscal health. *Id.* at § 2 (§ 8). Further details on both MAC and the Emergency Control Board can be found in Note, The Limits of State Intervention in a Municipal Fiscal Crisis, 4 Fordham Urban L.J. 546 (1976), and *Rapico, Inc. v. City of New York*, Civil Case Nos. 75–6168, 75–6246 (S.D.N.Y. May 17, 1976).[1]

The crucial portion of the Emergency Act for present purposes is the following:

"*Section 1. Legislative findings.* It is hereby found and declared that the financial emergency of the city of New York, recognized by the state, necessitates, as a matter of urgent public policy of the state, purchases of securities of the municipal assistance corporation for the city of New York by the pension and retirement systems for public employees in the city of New York and the state of New York.

"This legislature has found, declared and enacted that securities of the municipal assistance corporation for the city of New York are reasonable, prudent and proper investments for all public officers and bodies of this state and all trustees and other fiduciaries under the laws of this state.

"*Section 2. Purchases of securities.* The trustees of the following pension and retirement funds and systems for public employees in the city of New York and the state of New York are hereby *authorized and directed* to take any and all actions necessary or appropriate to cause such funds and systems to purchase the

---

1. For general background on the fiscal crisis itself, see Congressional Budget Office, New York City's Fiscal Problem: Its Origins, Poten-

tial Repercussions, and Some Alternative Policy Responses, Background Paper No. 1, Oct. 10, 1975.

principal amounts set forth after their respective names below, of bonds of the municipal assistance corporation for the city of New York:

(a) Teachers' retirement system of the city of New York: $200,000,000;

\* \* \* \* \* \*

"In order to obtain the funds necessary to purchase the bonds required by this chapter, the trustees of each of the said pension funds and retirement systems in accordance with rules and regulations adopted by such trustees shall have the right to borrow an amount not exceeding the obligation incurred by such pension fund or retirement system pursuant to this chapter and to pledge as collateral therefor such assets as they may deem advisable.

"The authorization and the direction of this section are rescinded as to any such purchase if by the date of such purchase the city of New York has defaulted in the payment of any of its outstanding bonds or notes." L.1975, ch. 868, § 7 (emphasis added).[2]

Defendant MAC acknowledges that the Retirement Board has purchased $275 million of MAC bonds and that five City pension funds (including the Retirement System), eleven commercial banks, and four City sinking funds have entered into an agreement that provides, among other things, that the Retirement Board will purchase $860 million of City bonds over a three-year period. The agreement allows the Retirement Board, under certain conditions, to choose MAC bonds in lieu of City bonds. Plaintiff contends that the Retirement Board's purchases up to December 31, 1975 were made "by selling at a loss highly rated marketable securities" and "by buying MAC securities at par directly from MAC corporation at a time when said MAC

securities were selling in the open market at a 20% discount." Complaint ¶ 23.

The "creation and maintenance of reserves in the contingent reserve fund" of the Retirement System are made "obligations of the City" of New York by the Administrative Code of the City of New York, ch. 20, § B20–30.0. The complaint alleges that defendant City has failed for several years to "make the contributions of money that statute required it to make to the Teachers' Retirement Board on account of the employment and service of" presently employed members of the Retirement System. Complaint ¶ 27. Thus, according to plaintiff, the assets currently held by the Retirement System as reserve funds are left as the only source of his retirement allowance. He contends that the Retirement Board's purchases of MAC bonds, made "under color of" L.1975, ch. 868, § 7, "substantially reduced the market value and actual value of the marketable securities owned by the Teachers' Retirement Board and thereby substantially reduced the assets and property available \* \* \* for use in paying" plaintiff his retirement allowance.

II.

Plaintiff's first claim for relief seeks a declaration that L.1975, ch. 868, § 7 (§ 2), and the purchases made by the Retirement Board pursuant thereto have violated plaintiff's rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution and have impaired the obligations of contract in violation of article I, section 10, clause 1 of the United States Constitution (U.S.Const. art. I, § 10, cl. 1) and article V, section 7, of the New York State Constitution (N.Y.Const. art. V, § 7). Plaintiff also seeks an injunc-

---

**2.** Certain amendments were made to L.1975, ch. 868, § 7 by L.1975, ch. 870, § 14. The latter substituted the word "obligations" for "securities" in the first three paragraphs quoted above. The following sentence was also added:

"The terms and conditions of such bonds, including the rates of interest thereon, shall be determined by the municipal assistance

corporation for the city of New York, after consultation with such trustees, provided such terms and conditions are found to be fair and reasonable by the New York state emergency financial control board."

Both L.1975, ch. 868, § 7 and L.1975, ch. 870, § 14 became effective September 9, 1975.

tion restraining further purchases and damages for past purchases.

■■■ On September 29, 1975, so much of L.1975, ch. 868, § 7, as "directed" pension funds to invest in MAC obligations was struck down by the New York Court of Appeals as a violation of N.Y.Const., art. V, § 7. *Sgaglione v. Levitt*, 37 N.Y.2d 507, 375 N.Y.S.2d 79, 337 N.E.2d 592, *motion for leave to reargue denied*, 37 N.Y.2d 924, 378 N.Y.S.2d 1027, 340 N.E.2d 754 (1975) (*Sgaglione* I). Since this decision renders moot plaintiff's attack upon the mandatory nature of L.1975, ch. 868, § 7 (§ 2), plaintiff shifts the brunt of his constitutional attack to what he characterizes as an amendment to L.1975, ch. 868, § 7. This statute is L.1975, ch. 890,[3] which provides, *inter alia*:

> "Notwithstanding any inconsistent provisions of law, the trustees of * * * the teachers' retirement system of the city of New York * * * may, in their discretion, purchase obligations of the city of New York or obligations of the municipal assistance corporation for the city of New York without regard to the percentage of the assets of any such system or fund invested in such obligations and without regard to the percentage of outstanding obligations of such issuer held or to be held by such system or fund." Section 1a.

> * * * * * *

> "Notwithstanding any other provision of law, including the provisions of subdivision one of section seventeen of the public officers law, the city of New York shall save harmless and indemnify all members of the board, officers, employees, trustees, fiduciaries and investment advisors of any such system or fund from financial loss arising out of any claim,

demand, suit, action or judgment for alleged negligence, waste or breach of fiduciary duty (a) resulting from the purchase by such systems and funds of any obligations of the city of New York or the municipal assistance corporation for the city of New York from such city or corporation or (b) resulting from the sale of any assets held in such systems and funds to produce sufficient revenues to purchase such obligations * * *". "Section 2a.

Although it deals with the same subject matter, L.1975, ch. 890 is not—as plaintiff suggests—denominated as an amendment to L.1975, ch. 868, § 7. It is never mentioned in the complaint and is only alluded to, without citation, in plaintiff's main memorandum. This Court will nevertheless treat plaintiff's supplemental memorandum of December 6, 1976—the first specific discussion of L.1975, ch. 890—as a motion to amend the complaint under Rule 15(a), F.R. Civ.P.[4]

Plaintiff continues to attack the constitutionality of L.1975, ch. 868, § 7 (§ 1), which declares that MAC obligations are "reasonable, prudent and proper investments for * * * all trustees".

The second claim for relief is based on the allegation that plaintiff and other retired teachers are denied equal protection of the laws and are deprived of their property without due process of law by New York City Administrative Code, ch. 20, § B20–6.0, which prevents them from voting for members of the Retirement Board. Plaintiff seeks a declaration that this provision violates the Fourteenth Amendment to the United States Constitution and an injunction to restrain its further operation

---

3. L.1975, ch. 890, was approved on December 5, 1975, but Sections 1 through 3 have retroactive effect from and after November 23, 1975. L.1975, ch. 890, § 5.

4. Defendants are not prejudiced by this Court's consideration of the constitutional attacks upon L.1975, ch. 890, § 1. The discretion there granted to trustees to purchase MAC securities is merely an amplification of the authorization contained in L.1975, ch. 868, § 7. *Sgaglione I*

invalidated only the direction to make purchases, leaving the authorization intact. The issue of voluntary purchases by the Retirement Board has been fully briefed by all defendants.

While defendants have not had an opportunity to brief the constitutionality of the indemnification provision, L.1975, ch. 890, § 2, this Court's disposition of plaintiff's Contract Clause claim obviates the necessity for briefs addressed to the former question by defendants.

and to require the Retirement Board to allow plaintiff and other retired teachers to vote for members of the Retirement Board.

### III.

■ The threshold question is whether either claim for relief requires that a three-judge court be convened, pursuant to 28 U.S.C. §§ 2281, 2284. Paragraph 6 of the prayer for relief requests such a court, "[s]ince the complaint seeks to enjoin the effect of a New York State statute and a New York City Administrative Code provision as unconstitutional." Although plaintiff has subsequently withdrawn this request, the question still must be considered, *sua sponte*, because it involves the extent of this Court's jurisdiction.

■ As noted above, plaintiff's claim, based upon federal constitutional grounds, for declaratory and injunctive relief against the legislative mandate to purchase MAC obligations, L.1975, ch. 868, § 7 (§ 2), is moot after *Sgaglione I*. As plaintiff now concedes, "this decision made it unnecessary for this Court to convene a three-judge federal Court," plaintiff's main brief at 27, to enjoin the operation of L.1975, ch. 868, § 7 (§ 2). He now seeks a declaratory judgment as to the unconstitutionality of L.1975, ch. 868, § 7 (§ 1) (legislative declaration that MAC obligations are "reasonable, prudent and proper investments") and L.1975, ch. 890, § 2 a (indemnification of trustees for suits resulting from purchases of MAC obligations). When only declaratory relief is sought, it can be granted or denied by a single district judge. See, e. g., *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 154–55, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).

■ Plaintiff also seeks to have the legislative authorization to purchase MAC obligations, L.1975, ch. 890, § 1 a, declared unconstitutional and to enjoin the Retire-

ment Board from exercising this authority to make voluntary purchases in the future. A three-judge court need not be convened to consider this claim for injunctive relief, because L.1975, ch. 890, is not a "State statute" within the meaning of 28 U.S.C. § 2281. The Supreme Court has consistently interpreted this term to include only statutes of "general and statewide application," and to exclude those that affect but a single district or region within the state. *Moody v. Flowers*, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967); *Rorick v. Board of Commissioners of Everglades Drainage District*, 307 U.S. 208, 59 S.Ct. 808, 83 L.Ed. 1342 (1939); *Ex Parte Collins*, 277 U.S. 565, 48 S.Ct. 585, 72 L.Ed. 990 (1928). See Nielsen, Three-Judge Courts: A Comprehensive Study, 66 F.R.D. 495, 503–05 (1975).

The statute whose operation plaintiff seeks to enjoin is entitled "New York City—Retirement Systems, Pension Funds—Purchases of New York City Obligations." It applies solely to New York City pension systems and to their purchases of MAC and City obligations. Its local nature is further shown by the fact that it was passed on home-rule request under a provision that applies exclusively to New York City, N.Y.Const., Art. IX, § 2(b).[5] Thus, although the New York City financial recovery program has important implications for the state and national economy, L.1975, ch. 890, is not a statute of statewide application for purposes of 28 U.S.C. § 2281. See *Rapico, Inc. v. City of New York, supra*, at 6–8, ruling that another portion of the recovery program, the New York State Emergency Moratorium Act for the City of New York, L.1975, ch. 874, was not a "statute of state-wide application."

■ Nor is a three-judge court required to consider the second claim, because it attacks only the constitutionality of a provi-

---

5. Under Article IX, section 2, of the New York Constitution, the State Legislature can "act in relation to the property, affairs or government of any local government only by general law," i. e., by a statute that affects all home-rule municipalities.

A "special law," which affects but a single city, can be passed only by the special procedure of a home rule request. There is a special provision for legislation affecting only New York City, which was employed here. N.Y. Const., art. IX, § 2(b).

sion of the Administrative Code of the City of New York dealing with the retirement system of a single group of New York City employees. This clearly is not a statute of state-wide application within the contemplation of 28 U.S.C. § 2281.

## IV.

 Plaintiff's claims against defendant City of New York under 42 U.S.C. § 1983[6] and its jurisdictional counterpart, 28 U.S.C. § 1343(3),[7] clearly cannot be maintained because a municipality is not a "person" within the meaning of Section 1983. *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973) (equitable and declaratory relief); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (damages). The same is true of the Retirement Board, see *Surowitz v. New York City Employees' Retirement System*, 376 F.Supp. 369 (S.D.N.Y.1974), and cases cited therein. It also appears that MAC and the Emergency Control Board, as instrumentalities of the state with financial responsibilities toward the City of New York, probably are likewise not "persons" within the meaning of Section 1983. See, e. g., *Monell v. Dept. of Soc. Serv. of City of New York*, 532 F.2d 259, 262–63 (2d Cir. 1976), *cert. filed*, —— U.S. ——, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977) (N.Y.C. Board of Education not a "person"); *Blanton v. State University of New York*, 489 F.2d

377, 382 (2d Cir. 1973) (State University not a "person"); *Williford v. People of California*, 352 F.2d 474, 476 (9th Cir. 1965) (state not a "person"); *Edwards v. New York*, 314 F.Supp. 469, 471 (S.D.N.Y.1970) (same); *Sams v. New York State Board of Parole*, 352 F.Supp. 296, 298–99 (S.D.N.Y.1972) (N.Y.C. Transit Authority), and cases cited therein. But see *Forman v. Community Services, Inc.*, 500 F.2d 1246, 1255 (2d Cir. 1974), *rev'd on other grounds* sub nom. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).[8]

 Plaintiff's claims against the institutional defendants, being premised directly upon deprivations of constitutional rights, do provide a basis for invoking federal question jurisdiction under 28 U.S.C. § 1331:

"Section 1331(a) vests District Courts with original jurisdiction of civil actions arising under the Constitution and laws of the United States. Apart from the fourteenth amendment, the only 'law' of the United States upon which the plaintiff relies is 42 U.S.C. § 1983, which will not support a claim against the municipal defendant. The complaint, however, alleges a deprivation by the defendant City [and other institutional defendants] of rights secured by [the Contracts Clause and] the Due Process Clause and seeks damages far in excess of $10,000. Thus,

---

**6.** "Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C § 1983 (emphasis added).

**7.** "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

 \* \* \* \* \* \*

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing

for equal rights of citizens or of all persons within the jurisdiction of the United States \* \* \*." 28 U.S.C. § 1343(3).

**8.** "[T]he State Housing Finance Agency has been said to be a 'person' within § 1983, though in that case there was also jurisdiction over it under § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), sovereign immunity having been waived. \* \* \* *Forman v. Community Services, Inc.*, [supra] \* \* \*. We need not consider whether the State Housing Finance Agency is a 'person' under § 1983, for that agency is not before us. \* \* \* To the extent that the language of the *Forman* opinion may be read to imply that *all* 'agencies' are persons under § 1983, 500 F.2d at 1255, we are not bound by the broad nature of the generalization and we doubt that it was so intended." *Monell v. Dept. of Soc. Serv. of City of New York, supra*, at 263 (footnotes omitted).

to the extent that relief is sought under the fourteenth amendment [and Contracts Clause], the plaintiff's claim 'arises under the Constitution * * * of the United States,' and jurisdiction over the subject matter exists under 28 U.S.C. § 1331(a)." *Perzanowski v. Salvio,* 369 F.Supp. 223, 229 (D.Conn.1974).

See *Bell v. Hood,* 327 U.S. 678, 681–84, 66 S.Ct. 773, 90 L.Ed. 939. (1946); *City of Kenosha v. Bruno, supra,* 412 U.S. at 514, 93 S.Ct. 2222 (remand instructions); *Brault v. Town of Milton,* 527 F.2d 730, 736 n. 1 (2d Cir. 1971) (*en banc*). Thus this Court does have jurisdiction to consider plaintiff's claims for injunctive and declaratory relief against the institutional defendants, if the amount in controversy requirement can be satisfied. *Matherson v. Long Island State Park Commission,* 442 F.2d 566, 568 (2d Cir. 1971); *Perzanowski v. Salvio, supra; Patterson v. Ramsey,* 413 F.Supp. 523, 528 (D.Md.1976), and cases cited therein.

 The institutional defendants contend that the first claim is too speculative to meet the $10,000 amount in controversy requirement. Plaintiff alleges in his complaint that the amount in controversy exceeds $10,000 exclusive of interest and costs, and he presents an affidavit that calculates his expected lifetime pension at over $94,000.[9] Where injunctive relief is sought, the amount in controversy is "the value of the right protected or the extent of the injury prevented." 1 Moore, Federal Practice, ¶ 0.96[3.–1], at 939 (2d ed. 1976); Wright, Law of Federal Courts, § 33, at 133 (3d ed. 1976). Here the injury to be prevented is the erosion of the portion of the trust corpus that stands behind plaintiff's retirement allowance. When the allegations of the complaint as to the City's likely inability to make contributions to the Retirement System and the unsoundness of the MAC obligations as investments are viewed in a light most favorable to the plaintiff, this Court cannot say for a "legal certainty" that the amount in controversy

does not exceed $10,000. *Cf. St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *Deutsch v. Hewes Street Realty Corp.,* 359 F.2d 96, 99 (2d Cir. 1966). Though difficult to prove, the claim here is not—as defendants suggest—so speculative as that dismissed in *Kheel v. Port of New York Authority,* 457 F.2d 46 (2d Cir. 1972), *cert. denied,* 409 U.S. 983, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972).

Insofar as concerns the claims for injunctive and declaratory relief against the individual defendants, these claims can be entertained under 28 U.S.C. §§ 1331 and 1343(3):

"There is no doubt that municipal and state officials, sued in their official capacities, are 'persons' within the meaning of § 1983 when they are sued for injunctive or declaratory relief." *Monell v. Dept. of Soc. Serv. of City of New York, supra,* at 264 (citations omitted).

### V.

Plaintiff bases his first claim upon the contention that certain state statutes and actions of the Retirement Board pursuant to authority granted by those statutes have impaired the obligations of contract, in contravention of art. I, § 10, cl. 1 of the United States Constitution. He argues that the allegedly impaired contract obligation was created by N.Y.Const., art. V, § 7, which provides:

"After July first, nineteen hundred forty, membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired."

In *Sgaglione I, supra,* the New York Court of Appeals announced that this contractual right extended to protection of sources of the benefits:

"[N]ecessarily implied in this constitutional, albeit perhaps limited, protection

---

**9.** Plaintiff's affidavit reveals that he was 67 years old when the complaint in this action was filed on February 15, 1976, and that he receives a retirement allowance of $8,112.48 per year.

Multiplying the latter figure by his life expectancy of 11.6 years, he arrives at an anticipated lifetime allowance of $94,104.77.

of the underlying 'contract' providing for benefits is the protection of the sources of funds for those benefits, whether by way of continuing contributions by employees, employers, or the reserve funds required to be maintained under the retirement plan. * * *. The same might be said about management of the funds: there is flexibility reserved to the Legislature, but it is not unlimited. * *. Close examination is therefore required of any radical change in means chosen to maintain the integrity and security of the sources from which the concededly protected benefits are to be paid." *Id.* at 512, 375 N.Y.S.2d at 83, 337 N.E.2d at 594. (citations omitted).

Thus, the portion of L.1975, ch. 868, § 7 that *directed* the New York State Comptroller, as trustee for the State Employees' Retirement System and the State Policemen's and Firemen's Retirement System to purchase specified amounts of MAC bonds was held to violate this state constitutional provision.

█ Plaintiff contends that statutory *authorization* to make purchases of MAC bonds, contained in L.1975, ch. 890, § 1 (and L.1975, ch. 868, § 7, as modified by *Sgaglione I*) similarly impairs his contractual rights to pension benefits. He does not link this argument to his attack upon the other statutes, but apparently contends that the combination of the statutory authorization plus the legislative declaration that MAC bonds are "reasonable, prudent and proper investments," L.1975, ch. 868, § 7 (§ 1), and the requirement that the City "save harmless and indemnify" the Retirement Board for suits brought as a result of their purchases of MAC bonds, L.1975, ch. 890, § 2, greatly encourage the Retirement Board to make investments in allegedly worthless MAC obligations, thereby reducing the value of the reserve fund so as to "impair" the contractual obligation to provide pensions.

In a case involving the alleged impairment of a contract by the partial repeal of the Illinois Teachers' Tenure Act, the Supreme Court set forth an analysis that is also appropriate, despite the difference in procedural context, for the present case:

"As in most cases brought to this court under the contract clause of the Constitution, the question is as to the existence and nature of the contract and not as to the construction of the law which is supposed to impair it. * * * [I]t is established that a legislative enactment may contain provisions which, when accepted as the basis of action by individuals, become contracts between them and the State or its subdivisions within the protection of Article I, § 10. * * *.

"On such a question, one primarily of state law, we accord respectful consideration and great weight to the views of the State's highest court but, in order that the constitutional mandate may not become a dead letter, we are bound to decide for ourselves whether a contract was made, what are its terms and conditions, and whether the State has, by later legislation, impaired its obligation. This involves an appraisal of the statutes of the State and the decisions of its courts." *Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 100, 58 S.Ct. 443, 82 L.Ed. 685 (1938).

See *Appleby v. New York*, 271 U.S. 364, 380, 46 S.Ct. 569, 70 L.Ed. 992 (1926); Hale, The Supreme Court and the Contract Clause: III, 57 Harv.L.Rev. 852, 869 (1944) ("the nature and extent of the obligation * * * are federal questions of *state* law") (Hale article). First, therefore, we must look to the law of New York at the time plaintiff's alleged contractual rights were created to see exactly what provisions are protected against impairment. Then we will consider recent state court interpretations of the contractual obligations.

Article V, § 7, of the New York Constitution was adopted on November 8, 1938, and, by its terms, makes the benefits of membership in a retirement system (such as the Teachers' Retirement System), as they existed as of July 1, 1940, a "contractual" obligation that may not thereafter be diminished or impaired. Prior to that date, the State Legislature had adopted the Administrative Code of the City of New York, L.1937, ch. 929. Chapter 20, Section B20–

31.0, of that Code made the members of the Teachers' Retirement Board trustees of the "several funds" of the Retirement System and gave them "exclusive control and management of such funds" and "full power to invest" the funds, subject only to the limitations "imposed by law upon savings banks".[10] At that time, state statutes authorized a large number of investments by savings banks, including obligations of the United States, New York State, and New York local governments, N.Y. Banking Law, § 239 (McKinney's 1937, derived from L.1914, ch. 369, § 239 and L.1928, ch. 446, § 1), as well as numerous authority obligations that were not backed by the faith and credit of the state or the city. The latter category included the Triborough Bridge Authority, N.Y.Pub.Auth.Law, §§ 564–65 (McKinney's 1939, derived from L.1933, ch. 145, §§ 11–12); the New York City Tunnel Authority, N.Y.Pub.Auth.Law §§ 639–40 (McKinney's 1939, derived from L.1936, ch. 1, §§ 11–12); the Henry Hudson Parkway Authority, N.Y.Pub.Auth.Law §§ 237–38 (McKinney's 1939, derived from L.1934, ch. 138, §§ 12–13); the New York City Parkway Authority, N.Y.Pub.Auth.Law §§ 287–88 (McKinney's 1939, derived from L.1938, ch. 90, §§ 14–15); and even the New York State War Memorial Authority, N.Y.Pub. Auth.Law, §§ 1384–85 (McKinney's 1939,

derived from L.1934, §§ 7, 9). Over the years, the categories of investments available to savings banks (and thus to the Retirement Board) have been expanded to include other special authorities.

Thus, at the time the contractual relationship was created, the state law recognized investment discretion by the Retirement Board[11] within categories set, and periodically expanded, by the State Legislature.

> "Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order."
>
> *Home Bldg. & L. Assn. v. Blaisdell,* 290 U.S. 398, 435, 54 S.Ct. 231, 239, 78 L.Ed. 413 (1933).

When the above-described "existing laws" are "read into [the] contract[]," it becomes clear that pension beneficiaries, such as plaintiff, never had contractual rights to prevent the trustees of their pension funds from making discretionary investments within categories set by the State Legislature or to prevent the Legislature from expanding the categories.[12]

Moreover, the state's highest court has announced support for legislative expansion

---

**10.** This provision remains part of the current Administrative Code.

**11.** Similar broad investment discretion was granted to the trustee of the New York State Employees' Retirement System funds, the New York State Comptroller. See N.Y. Civil Service Law §§ 54, 57 (McKinney's 1940); N.Y. State Finance Law § 98 (McKinney's 1940).

**12.** The two cases cited by plaintiff, *State Teachers' Retirement Board v. Giessel,* 12 Wis.2d 5, 106 N.W.2d 301 (1960), and *Weaver v. Evans,* 80 Wash.2d 461, 495 P.2d 639 (1972) (en banc), do not support a contrary conclusion. *Giessel* held that earnings of the Wisconsin State Teachers' Retirement System could not be appropriated by the State Legislature to finance the Governor's Commission on the Study of Retirement Systems. The court said: "The [teachers' contractual] right includes the proper use of the earnings. The expense of administering the system, losses on investments and other proper expenses and charges are, of course, to be paid by the

system. However, the legislature and the plaintiff board are not free to spend or appropriate the earnings of the fund except in a manner authorized by statute relating to the state teachers' retirement system." 106 N.W.2d at 305.

In the instant case, "losses on investments" are being attacked. Even if they do occur as alleged, they are a "proper expense" of the Retirement System, unlike the Study Commission in *Giessel.*

In *Weaver,* the Governor curtailed the transfer of funds legislatively appropriated for the Washington State Teachers Retirement System; as a result, the pension fund trustees had to withdraw moneys from the pension reserve fund to pay current pensions. The court held that the Governor's action violated the state statutory policy of systematic funding of the pension system. In the present case, investment powers of the trustees—not City appropriations to the Retirement System—are under attack.

of the investments available to pension fund trustees:

> "There is no quarrel, as indeed there could not be, with the exercise of legislative power to expand the kinds of investments [the trustee] might make, including MAC securities (see State Finance Law, §§ 98, 98–a, as added by L.1975, chs. 868, 870), or to restrict the classes of investments he might make from time to time (see Retirement and Social Security Law, §§ 13, 313, and its amendments from time to time)." *Sgaglione I, supra,* 37 N.Y.2d at 512, 375 N.Y.S.2d at 83, 337 N.Y.S.2d at 595.

In finding a violation of N.Y.Const. Art. V, § 7, by the legislative *mandate* that the trustee invest a minimum amount in MAC obligations, the *Sgaglione I* court expressly distinguished legislative *authorization* to make such investments:

> "The ultimate difference is between authority to invest and a mandatory direction to invest in certain securities, and in certain minimum amounts * * *.
>
> "The comments last made have a special significance. They mean that neither plaintiffs nor the courts, simply because a constitutional provision is involved, are entitled in the present context to assess the market worthiness of securities in which the State Comptroller may invest. That discretion is his solely except as limited by the continuing power of the Legislature to expand or restrict the classes and kinds of investment in which he may place the funds in his care." *Id.* at 513, 375 N.Y.S.2d at 84, 337 N.E.2d at 595.

Lower New York State courts, in reliance upon this language, have dismissed attacks, similar to the one at bar, upon discretionary purchases of MAC and/or City obligations. The most significant of such cases is *Simpson v. Mitchell,* N.Y.L.J., Dec. 4, 1975 (p. 8, col. 4, 5), *aff'd without opinion,* 386 N.Y. S.2d 350 (App.Div. 1st Dep't, June 29, 1976), in which the plaintiff sought

> "a preliminary injunction restraining defendants from directly or indirectly permitting any funds or assets of the Teachers' Retirement System of New York to be invested in, loaned to or otherwise pledged or used to purchase securities of the Municipal Assistance Corporation for the City of New York, the State of New York, or any other agency, instrumentality or political subdivision of said state." N.Y.L.J., Dec. 4, 1975 (p. 8, col. 4).

In her sixth cause of action, the plaintiff alleged that actions of the Retirement Board in purchasing the MAC securities and actions of MAC in issuing and selling them impaired the obligations of contracts, in violation of U.S.Const. art. I, § 10 and N.Y. Const. art. V, § 7, and deprived her of property without due process of law, in violation of the Fourteenth Amendment to the United States Constitution and article I, Section 7, of the New York State Constitution. Not only was the preliminary injunction denied, but Justice Korn of the Supreme Court, New York County, dismissed the complaint as legally insufficient, relying in part upon the language from *Sgaglione I* quoted above. The decision was unanimously affirmed by the Appellate Division, First Department. Other state courts have come to the same conclusion in similar cases.[13]

---

**13.** In *New York City Civil Service Retired Employees Ass'n v. Roche,* Index No. 18043/75 (Sup.Ct.N.Y.Co. Oct. 17, 1975), the plaintiffs sought to enjoin purchases of MAC bonds by the New York City Civil Service Employees' Retirement Fund, the New York City Fire Department Pension Fund, and the New York City Police Pension Fund. Justice Kirschenbaum denied the application for injunctive relief, citing *Sgaglione I* for the proposition that the courts should not substitute their investment judgment for that of the trustees.

The voluntary purchases of New York State obligations by the State Comptroller, acting as trustee of the New York State Common Retirement Funds, were attacked in *Sgaglione v. Levitt,* 50 A.D.2d 1105, 373 N.Y.S.2d 659 (3d Dep't), *aff'd on certified question sub nom. Westchester Chapter, Civil Service Employees Ass'n v. Levitt,* 37 N.Y.2d 519, 375 N.Y.S.2d 294, 337 N.E.2d 748 (1975) (Sgaglione II). The Appellate Division, Third Department, upheld the denial of injunctive relief, on the same basis:

While these recent state court rulings as to the terms of the contract created by N.Y.Const., art. V, § 7 are not controlling with respect to this federal Contracts Clause claim, *Indiana ex rel. Anderson v. Brand, supra,* 303 U.S. at 100, 58 S.Ct. 443; *Appleby v. New York, supra,* they are entitled to great weight. See, *e. g., Rapid Transit Corp. v. New York,* 303 U.S. 573, 593, 58 S.Ct. 721, 82 L.Ed. 1024 (1938); *Phelps·v. Board of Education,* 300 U.S. 319, 322–23, 57 S.Ct. 483, 81 L.Ed. 674 (1937); see generally Hale article, *supra*; Note, Contractual Aspects of Pension Plan Modification, 56 Colum.L.Rev. 251, 261 n. 50 (1956). These recent state court cases, coupled with my own analysis, lead me to conclude that plaintiff's contract does not include an implied provision that the Legislature will not expand the number of investments available to the Retirement Board. Hence the attacks upon the statutory authorization on Contracts Clause grounds must fail.[14] Cf. *Gorman v. City of New York,* 280 App.Div. 39, 110 N.Y.S.2d 711, 715–16 (1st Dep't 1952), *aff'd,* 304 N.Y. 865, 109 N.E.2d 881 (1952), *remittitur amended,* 304 N.Y. 973, 110 N.E.2d 895 (1953), *appeal dismissed,* 345 U.S. 962, 73 S.Ct. 950, 97 L.Ed. 1381 (1953); *Stoneridge Apts. Company v. Lindsay,* 303 F.Supp. 677, 679 (S.D.N.Y.1969).

Insofar as plaintiff attacks the actions of the Retirement Board in exercising the discretion granted by these statutes, he is merely alleging a breach of fiduciary duty or waste of trust assets. These claims

"[T]he discretion of the Trustee 'is his solely except as limited by the continuing power of the Legislature to expand or restrict the classes and kinds of investment in which he may place the funds in his care.' (*Sgaglione v. Levitt,* 37 N.Y.2d 507, 513, 375 N.Y:S.2d 79, 337 N.E.2d 592, 595.) The Legislature has, to date, not seen fit to restrict the Comptroller's discretion to make the class of investment here in issue, and this Court cannot purport to act in the Legislature's stead. In view of the above, we affirm the orders of Special Term denying the motions for preliminary injunctions as a matter of law." 50 A.D.2d at 1106, 373 N.Y.S.2d at 661.

are cognizable under state tort ·law, not under the federal Contracts Clause.

## VI.

Much the same analysis applies to plaintiff's claim of a deprivation of property without due process in violation of the Fourteenth Amendment to the United States Constitution. The extent of his property rights is determined, in the first instance, by state law:

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

See *Gotkin v. Miller,* 514 F.2d 125, 128 (2d Cir. 1975); *Robbins v. Police Pension Fund,* 321 F.Supp. 93 (S.D.N.Y.1970).

The state law clearly provides that "neither the plaintiffs nor the courts * * * are entitled * * * to assess the market worthiness of ·securities in which [a public pension fund trustee] may invest. That discretion is solely his except as limited by the continuing power of the Legislature to expand or restrict the classes of investment in which he may place the funds in his care." *Sgaglione I, supra,* 37 N.Y.2d at 513, 375 N.Y.S.2d at 84, 337 N.E.2d at 595. In short, plaintiff clearly has a vested right in receiving his pension benefits, but not in

14. Since I have concluded that plaintiff did not have a protected contractual right (within the meaning of the Contracts Clause) to control Retirement Board investments, I do not reach the question whether the Legislature—in permitting investments in MAC obligations—has, as it may, modified contractual rights within reason. See *City of El Passo·v. Simmons,* 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965); *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934); *Lyon v. Flournoy,* 271 Cal.App.2d 774, 76 Cal.Rptr. 869 (1969), appeal dismissed for want of substantial federal question, 396 U.S. 274, 90 S.Ct. 564, 24 L.Ed.2d 465 (1970); *Koch v. Yunich,* 533 F.2d 80, 86 (2d Cir. 1976).

regulating the investment policies set by the Legislature and the Retirement Board. Plaintiff's remedy for an alleged breach of fiduciary duty is a state tort action.

■ For these reasons, Count I of the complaint must be dismissed for failure to state a claim upon which relief .can be granted.

## VII.

■ In his second claim for relief, plaintiff contends that he and other retired teachers are denied equal protection of the laws and are deprived of their property without due process of law by New York City Administrative Code, ch. 20, § B20–6.0 (Code), which excludes them from voting for the three directly elected members of the Teachers' Retirement · Board. Under Section B20–6.0, the Retirement Board consists of the President of the New York City Board of Education, the New York City Comptroller, two members appointed by the Mayor, and three members ·"elected from the contributors" of the Retirement Association for three-year terms. Since the term "contributors" includes only currently employed persons,[15] retired teachers, who fall in the category of "beneficiaries" of the Retirement Association,[16] have no vote. According to plaintiff,

"Such ineligibility of retired teachers to vote in the election of three teacher-members of the Teachers' Retirement Board makes it possible for four members of that Board appointed by and representing the City of New York and the

management of the Board of Education and City University, plus three members representing teachers currently actively employed therein, to dispose of the property and affairs of the said Retirement System without the consent or knowledge of the beneficiaries[,] viz[.,] the retirees." Complaint, ¶ 32.

This count must be dismissed as to defendants ·Levitt, Goldin (in his capacity as City Comptroller),[17] the Emergency Control Board and MAC, because they have no connection with the substance of this claim. As to the other defendants, the claim is without merit.

■ The "one man-one vote" principle of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 ·(1964), and its progeny applies to "units of local government having *general* governmental powers over the entire geographic area served by the body", *Avery v. Midland County*, 390 U.S. 474, 485, 88 S.Ct. 1114, 1120, 20 L.Ed.2d 45 (1968) (emphasis added), even when these general purpose bodies hold special elections, *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (property qualifications impermissible for voters in election regarding issuance of bonds for municipally-owned utility). The principle has also been extended to local school boards, *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), and to a junior college district with substantial governmental powers in its area,[18] *Hadley v. Junior College District*, 397 U.S. 50, 90 S.Ct. 791, 25

---

**15.** "Contributor" is defined as "any member of the retirement association", Code, ch. 20, § B20–1.0(10), and the "membership" includes "[a]ll teachers" and "[a]ll transferred contributors," *id.* at § B20–3.0. Teachers and transferred contributors are defined, respectively, as persons currently employed by the Board of Education (and related bodies), *id.* § B20–1.-0(7), and former employees who are still working for the City of New York, *id.* at § B20–22.0.

**16.** " 'Beneficiary' shall mean any person in receipt of a pension, a pension-providing-for-increased-take-home-pay, an annuity, a retirement allowance, or other benefit as provided in this title." Code, ch. 20, § B20–1.0(12). See *id.* at § B20–21.0. Thus, the class of persons ex-

cluded from voting is broader than just retired teachers.

**17.** He is, of course, closely connected with the claim in his capacity as a member of the Retirement Board.

**18.** The junior college trustees "levy and collect taxes, issue bonds with certain restrictions, hire and fire teachers, make contracts, collect fees, supervise and discipline students, pass on petitions to annex school districts, acquire property by condemnation, and in general manage the operations of the junior college * *. We feel that these powers, while not fully as broad as those of the Midland County Commissioners, * * * certainly show that the trustees perform important governmental functions

L.Ed.2d 45 (1970). Thus, any limitation on the franchise in these situations must be subjected to "strict scrutiny" by the judiciary.

The one man-one vote requirement does not, however, apply to special purpose local governments. *Salyer Land Co. v. Tulare Water District*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973); *Associated Enterprises Inc. v. Toltec Watershed Improvement District*, 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973). See *Education/Instruccion, Inc. v. Moore*, 503 F.2d 1187 (2d Cir. 1974), *cert. denied*, 419 U.S. 1109, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975). *Salyer* held that the Equal Protection Clause was not violated by a California statute that permitted only agricultural landowners, with votes weighted according to the assessed value of their land, to vote in elections for a local water storage district. Though the water district had numerous governmental powers—to acquire and operate waterworks, to fix tolls, to make assessments, to condemn private property, and to authorize bonds, 410 U.S. at 724, 728, 93 S.Ct. 1224—it did "not exercise what might be thought of as 'normal governmental' authority," and its actions "disproportionately affect[ed] landowners." *Id.* at 729, 93 S.Ct. at 1230. Similarly, in *Associated Enterprises*, the Wyoming Watershed Improvement District had the "power to take land by eminent domain, to issue bonds, to levy taxes, and to provide plans for flood control", 410 U.S. at 749, 93 S.Ct. at (Douglas, J., dissenting), yet a referendum limited to landowners was not subject to the strict scrutiny test.

Even if the Retirement Board could be characterized as a "local government authority" for purposes of this voting rights claim, it clearly would be a special purpose local body. Its activities involve only the management and administration of the pension system for a single group of New York City employees. It does not have even the governmental powers found insufficient to invoke the one man-one vote principle in *Salyer* and *Associated Enterprises*, and many of its activities disproportionately affect "contributors." [19]

While the Retirement Board has important City officials as members, possesses "the powers and privileges of a corporation" under local law, Code, ch. 20, § B20–10.0, and (normally) receives financial contributions from the City treasury, it is not a governmental body that exercises powers over a specified geographic area; it is simply a public employee pension organization. Like New York State's off-track betting corporations, it is "a scheme in which there are 'certain functionaries whose duties are so far removed from normal governmental activities' that compliance with one man-one vote requirements is not constitutionally required." *Slisz v. Western Regional Off-Track Betting Corp.*, 382 F.Supp. 1231 (W.D.N.Y.1974). See *Davis v. American Telephone and Telegraph Company*, 478 F.2d 1375 (2d Cir. 1973) (even if government-regulated corporation were subject to Fourteenth Amendment, one man-one vote did not apply, because "it does not exercise 'normal governmental' authority").[20]

---

within the districts, and we think these powers are general enough and have sufficient impact throughout the district to justify the conclusion that the principle which we applied in *Avery [v. Midland County, supra]* should also be applied here." 397 U.S. at 53–54, 90 S.Ct. at 794. (footnotes omitted).

**19.** The Retirement Board adopts rules respecting retirement qualifications, Code, ch. 20, § B20–45.0; appoints a medical board, § B20–18.0, to review applications for retirement for "disability," § B20–42.0, and for "accident disability," § B20–42.1; determines the amount of service credits contributors receive toward retirement, § B20–4.0; extends loans to active

teachers, § B20–37.0; allows contributors to withdraw excess contributions, under certain conditions, § B20–24.0; adopts actuarial tables to determine future benefits, § B20–13.0, and City contribution levels, § B20–26.0; and sets regulations as to members' contributions, § B20–20.

**20.** "The constitutional command is not one person, one vote but equal protection of the laws, and what it requires by way of representation in a given assembly must depend on the purposes for which the assembly is convened and the nature of the decisions it makes. The Supreme Court's inquiry into these matters has led it to the conclusion that where the assem-

■ Since the right to vote for such a limited purpose board is not a "fundamental right," and pension beneficiaries are not a "suspect class," the appropriate standard for reviewing the election provisions of Code, ch. 20, § B20–6.0, is the rational relationship test. *San Antonio Ind. School District v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Thus,

> "[e]ven though [retired teachers] derive no benefit from the *Reynolds* and *Kramer* lines of cases, they are, of course, entitled to have their equal protection claim assessed to determine whether the * * * decision to deny the franchise to [retired teachers] while granting it to [contributors] was 'wholly irrelevant to achievement of the regulation's objectives,' *Kotch v. River Port Pilot Comm'rs*, 330 U.S. 552, 556, 67 S.Ct. 910, 91 L.Ed. 1093 (1947)." *Salyer Land Co. v. Tulare Water District, supra*, 410 U.S. at 730, 93 S.Ct. at 1231.

This standard is clearly met because the Retirement Board performs a variety of functions that affect only current "contributing" members,[21] contributions are made only by active (non-retired) members, the retirement allowance (a retired teacher's only real stake in the Retirement System) is set by the Board before he or she retires, and the elaborate election and nomination procedures established in Code, ch. 20, § B20–6.0 (all based upon specified school buildings) could not easily be transposed to permit voting by widely dispersed beneficiaries.[22] These factors provide a sufficiently rational basis for the voting requirements to satisfy both the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. See *Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Therefore, plaintiff's voting rights claim is without merit.

For these reasons, both counts of the complaint are dismissed.

SO ORDERED.

---

bly exercises formal governmental powers one person, one vote is ordinarily required. A similar inquiry in other contexts may well reveal that the public and private interests in making decisions through some other scheme of representation outweigh the interests served by numerically equal apportionment."

*Ripon Society v. National Republican Party*, 173 U.S.App.D.C. 350, 525 F.2d 567, 580 (1975) (en banc), cert. denied, 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976).

**21.** See note 19 *supra*.

**22.** Plaintiff's argument that retirees and contributors have different interests is not sufficient to counter this analysis, since the dissent in *Salyer* pointed out that the disenfranchised residents there had interests significantly different from those of the large landowners who voted. 410 U.S. at 737–38, 93 S.Ct. 1224 (Douglas, J., dissenting).